GLOBE NEWSPAPER COMPANY *vs.* COMMONWEALTH.

Middlesex.    March 30, 1905. — June 21, 1905.

Present: KNOWLTON, C. J., MORTON, LATHROP, & BRALEY, JJ.

*Error, Writ of.    Contempt.*

A writ of error from this court lies to reverse a judgment of the Superior Court ordering the proprietor of a newspaper to pay a fine for contempt of court in publishing after an indictment for murder and before the trial a statement and discussion of a portion of the government evidence supposed to have been prepared for the trial.

It is not a ground for reversing a judgment of the Superior Court, ordering the proprietor of a newspaper to pay a fine for contempt of court in publishing a statement of a portion of the government evidence supposed to have been prepared for a murder trial with facsimiles of handwriting and signatures and a discussion of the opinions of experts, that at the time of the publication the trial was not in progress nor immediately to take place, if the indictment had been found several months before and a time had been appointed for the trial and afterwards the trial had been postponed and its date had not been fixed. Nor is it any ground for the reversal of such a judgment that the statements in the publication were true, or that the publisher did not intend to injure either of the parties to the case or to interfere with the administration of justice.

KNOWLTON, C. J.    This is a writ of error to the Superior Court, to correct alleged errors in the proceedings whereby the plaintiff in error was found guilty of a contempt of court in publishing in its newspaper two articles relative to a prosecution for murder, upon an indictment then pending against one Charles L. Tucker.

The first question is whether a writ of error lies in such a case. This question was considered and decided affirmatively in the case of *Hurley* v. *Commonwealth, ante,* 443.

The first assignment of errors is that the publication did not constitute contempt, in that " said articles were published, not during the progress of the Tucker trial nor immediately before said trial, but at a time when the assignment of the date for said trial had been revoked and said trial had been indefinitely postponed."    The defendant's plea in this part of the case is, *In nullo est erratum.*    This raises the question of law, whether the publication of an article which otherwise would constitute contempt of court, as tending to obstruct the administration of jus-

tice, can be justified on the ground that the trial to which it relates is not then in progress, nor immediately to be begun, but is to occur at a time to be afterwards fixed. When the articles and the circumstances of publication are such as appear in the present case, we are of opinion that it cannot be so justified. The disturbing and obstructing effect of such an article might be greater if the publication was immediately before the trial than if it occurred months before, and this should be taken into account in imposing the sentence. In some cases, the difference in the degree of detriment that would be expected to result might be sufficient to constitute a contempt if the publication were just before the trial, when the same publication, a long time before the trial, would affect the case so little as not to deserve punishment. But it is enough to subject the offending publisher to punishment if the publication is very objectionable, and the case to which it relates is pending at the time of publication. *Onslow's case*, L. R. 9 Q. B. 219. *Hunt* v. *Clarke*, 58 L. J. Q. B. 490. See also *In re Cheltenham & Swansea Railway Carriage & Wagon Co.* L. R. 8 Eq. 580 ; *In re Sturoc*, 48 N. H. 428 ; *Respublica* v. *Oswald*, 1 Dall. 319. In *Rex* v. *Parke*, [1903] 2 K. B. 432, the publication in a newspaper was made before one accused of murder was even indicted. It was contended that as no cause was pending in the high court, and it was not certain that there would be an indictment, the high court had no jurisdiction to fine the publisher for contempt. Proceedings having been instituted before a magistrate, it was held, after the fullest consideration, that the court had jurisdiction, and punishment was inflicted. Wills, J. said in the opinion : " Great stress has been laid upon an expression which has been used in the judgments upon questions of this kind — that the remedy exists when there is a cause pending in the court. We think undue importance has been attached to it. . . . It is possible very effectually to poison the fountain of justice before it begins to flow. It is not possible to do so when the stream has ceased." In the present case the indictment was found several months before the publication, and the time for trial had been appointed and postponed. The plaintiff in error had full knowledge that the publication might affect the proceedings in the pending case. The facts stated in this assignment show no error.

The second assignment of errors was on the ground " that said articles were true and impartial statements of news and facts, were not intended to injure either the prosecution or the defence in said trial, and were not intended to reflect upon the dignity of the court or to hinder or interfere with the due administration of justice." The defendant in error moved to strike out this assignment, on the ground that the matters alleged in it were immaterial. At the hearing before a single justice the parties agreed that an order might be entered, granting this motion, with a stipulation that if, as matter of law, the motion should have been denied, the plaintiff in error should take such benefit from the assignment as the full court might deem it entitled to under the agreed statement of facts. It was accordingly so ordered.

As a preliminary to the discussion of the question thus raised, it may be well to refer to the publication. Two articles were published, the first in the Boston Sunday Globe of September 18, 1904, and the second in the Boston Daily Globe, on Monday, September 19, 1904. The first was a very long and elaborate article, which, after striking headlines, began with a facsimile of a specimen of Charles L. Tucker's handwriting taken from a letter, with his signature, followed immediately by a facsimile of a paper found by the side of the body of Mabel Page, who was murdered. Then came headlines, the first of which was: " Battle of the experts bids fair to be one of the most notable in the history of murder cases." The first part of the general discussion of the subject is entitled, " Analysis of the disputed ' Morton ' address," and it goes at great length into the particulars of likeness and unlikeness in the handwriting, as they might appear to experts, referring to letters and parts of letters, as well as to the words, including interviews with four different experts in handwriting, who were said to have been employed by the Commonwealth, and a very elaborate discussion of the supposed relations of every part of the evidence to be found in these papers to the other evidence on which the Commonwealth was expected to rely. The supposed views and opinions of the experts in handwriting were given, with a very full statement purporting to be made by one of them in an interview, and with much briefer statements made by the others who declined to talk about par-

ticulars.  The acts and methods of the attorney general and his assistants in the preparation of the case, in connection with this writing, were stated in detail.  The account was embellished in its different parts with pictures of the four experts, and was of a sensational character.  The article in the paper of Monday was headed, " New interest in the Tucker case.  Globe's publication of facsimile of handwriting has aroused it."  It referred to the slip of paper as the " leading and most assiduously guarded feature of the government case against Charles L. Tucker."  It said, among other things, " Every one had an opportunity to see this 'Morton' address, examine it for himself and judge of its importance in the solution of the murder mystery. . . . Naturally, every reader set out to constitute himself a handwriting expert, and thousands of Globe readers were analyzing the ' Morton ' penmanship yesterday and forming their own impressions as to its likeness to the hand of the prisoner.  Of course there were countless opinions on both sides of this question.  The account of how the leading handwriting experts proceeded to scrutinize this evidence and reach their conclusions was also instructive." In this article there was a further discussion, at considerable length, of additional supposed features of the evidence, all designed, so far as possible, to give the public a picture of the expected trial, as it would appear whenever it should occur.

It needs no argument to show that such publications were highly improper, and were a gross interference with the administration of justice in an important criminal case.  The effect of the first publication, as described in the second, was such as no newspaper publisher had a right to attempt to produce in anticipation of a trial.  In *Hunt* v. *Clarke*, 58 L. J. Q. B. 490, Lord Justice Cotton said in the opinion: " If any one discusses in a paper the rights of a case or the evidence to be given before the case comes on, that, in my opinion, would be a very serious attempt to interfere with the proper administration of justice.  It is not necessary that the court should come to the conclusion that a judge or a jury will be prejudiced, but if it is calculated to prejudice the proper trial of a cause, that is a contempt, and would be met with the necessary punishment in order to restrain such conduct."

The effect of this publication would naturally be to absolutely

disqualify many persons to sit as jurors, and thus make more difficult the work of the court in endeavoring to impanel an impartial jury. It would be likely, even without their consciousness of bias, to affect the minds of other persons, who might be permitted to sit upon the jury on the ground that they had not formed such an opinion as to render them unfit to perform this public duty. In other ways which it is not necessary to state, such publications might be detrimental to the public interests involved in the pending case. The writer had not the excuse that he was communicating facts of a public nature which it might be proper to publish. The article was a disclosure of the efforts of the Commonwealth's officers, in the examination and preparation of evidence, information of which, if one chanced to obtain it, should have been treated as confidential.

The question raised by the second assignment of errors is whether the truth of such a publication, and the lack of a positive intention on the part of the publisher to injure either of the parties to the case, or to interfere with the administration of justice, relieves him from liability for contempt. We have no doubt that such facts are material in relation to the punishment that should be inflicted. In certain classes of cases for criminal contempt in the courts of common law, where the question was whether one intended to reflect upon the dignity of the court, it has been held that the accused may purge himself by an answer under oath, disavowing any wrongful intent or disrespect to the court. *Wells* v. *Commonwealth*, 21 Gratt. 500. *Ex parte Biggs*, 64 N. C. 202. *In re Walker*, 82 N. C. 95. *Buck* v. *Buck*, 60 Ill. 105, 106. It is, however, the better rule, that such a disavowal is not conclusive, and that the whole matter is for the court, upon the facts and evidence. *State* v. *Matthews*, 37 N. H. 450. *Huntington* v. *McMahon*, 48 Conn. 174. *In re Chadwick*, 109 Mich. 588, 604. In reference to a case like the present, where something is done which obviously has a direct tendency to obstruct the administration of justice in a court, the rule stated in this Commonwealth seems to require, to subject one to punishment for contempt, no intent other than the intent to do the act itself which is objectionable. *Cartwright's case*, 114 Mass. 230. *Telegram Newspaper Co.* v. *Commonwealth*, 172 Mass. 294, 300. Under these decisions the actor, in such cases,

should be presumed to intend the natural consequences of his wilful act, and he should not be permitted to show, in justification, that he was ignorant of the probable consequences of it.

We are of opinion that such a publication of evidence procured by the officers of the law is not justified by showing that the statements are true, and that the intentional publication was without an express intent to injure either of the parties to the case, or to reflect upon the dignity of the court, or to hinder or interfere with the administration of justice. It follows that the plaintiff can take nothing by its writ.

*Judgment affirmed.*

*C. T. Gallagher*, (*H. Whitmore* with him,) for the plaintiff in error.

*F. H. Nash*, Assistant Attorney General, for the Commonwealth.