## DALE v. STATE OF INDIANA.

[Nos. 24,319, 24,310.   Filed February 25, 1926.   Rehearing denied June 11, 1926.].

1. CONTEMPT.—*Defamatory newspaper article attacking the grand jury, jury commissioners and judge of a court held criminal contempt.*—A defamatory newspaper article attacking the grand jury, the jury commissioners and the court' appointing them, and asserting that the editor's indictment was the result of a conspiracy, *held* a criminal contempt as one directed against the dignity and authority of the court through its officers.   p. 117.

2. CONTEMPT.—*Criminal contempt defined.*—Any contempt, whether direct or constructive, which attacks the integrity of the court or its officers and tends to bring the court into disrepute or which tends to obstruct the administration of justice by the court, is a criminal contempt.   p. 117.

3. CONTEMPT.—Ordinarily, a contempt of court which is not manifested in the immediate presence of the court is deemed a constructive or indirect contempt.   p. 117.

4. CONTEMPT.—*Publication of article in newspaper defaming the judge and other officers of the court held direct contempt.*— The publication of an article defaming the judge of a court, the grand jury, the prosecuting attorney and the jury commissioners, tending to bring such officers into disrepute and to obstruct the administration of justice by such court, constitutes a direct contempt of court.   p. 118.

5. CONTEMPT.—*Power of constitutional courts to punish contempts is inherent.*—The constitutional courts have inherent power to punish contempts, and the statute regulating the procedure in contempt proceedings is merely a recognition of the broad powers which such courts had from their inception.   p. 118.

6. CONTEMPT.—*Statute authorizing change of judge in civil, statutory or equitable proceeding not triable by jury is not applicable to direct contempt proceedings.*—Section 443 Burns 1926, providing for a change of judge in "civil, statutory or equitable" proceeding not triable by jury is not applicable to the trial of a charge of direct contempt of court, as such a proceeding is neither civil nor criminal, although it partakes of the nature of both.   p. 118.

7. CONTEMPT.—*Trial and punishment for direct contempt is summary, and change of judge is not allowed.*—The law is well established that the trial and punishment for a direct contempt is summary, which necessarily implies that the court acts upon the instant in hearing the charge and in pro-

nouncing punishment on the offender, and a change of judge is not allowed. p. 121.

8. CONTEMPT.—Criminal contempts are to be tried the same as direct contempts, and a change of judge cannot be demanded. p. 121.

9. CONTEMPT.—*Change of venue in criminal contempt not authorized.*—A criminal contempt is not a criminal case and §2235 Burns 1926 authorizing a change of venue in criminal cases is not applicable thereto. p. 122.

10. CONTEMPT.—*Meaning and intent of alleged contemptuous publication and whether or not contemptuous are for the court to determine.*—The meaning and intent of an alleged contemptuous newspaper article are for the court to determine by a fair interpretation of the language used, and it is also for the court to determine whether such article is contemptuous *per se* or because of the implications and innuendoes therein. p. 123.

11. CONTEMPT.—*When disclaimer of intent to bring the court into disrepute not allowed.*—A disclaimer by verified answer of disrespect for the court or of any intent to bring the court into disrepute or to interfere with the administration and business of the court is not sufficient to purge one charged with contempt where the contemptuous intent is plain from the language used. p. 123.

12. CONSTITUTIONAL LAW.—The constitutional guaranty of freedom of the press is not infringed by a proceeding for contempt of court and a conviction thereunder based upon a publication which tends to obstruct the administration of justice. p. 123.

13. CONTEMPT.—*Truth not defense to contempt tending to degrade and embarrass the court.*—The truth of a published contemptuous article tending to degrade a court and to bring it into contempt, or to embarrass it in the consideration of a pending case, is no defense to a charge of contempt nor is absence of intent to commit a contempt. p. 123.

14. CONTEMPT.—*Publication was contemptuous if it tended to bring a court into disrepute or to hinder it in judicial proceedings.*—A published newspaper article was contemptuous if it, directly or indirectly, tended to bring the court into disrepute or tended to hinder it in the administration of its judicial proceedings in cases then pending before it. p. 123.

15. CONTEMPT.—*Repetition by accused of contemptuous article in pleading the truth of the article was not necessary, a reference to the article being sufficient.*—Where the publisher of a newspaper was charged with contempt of court in publishing an article reflecting on the court, it was not necessary, in an attempt to purge himself of the contempt, to set out a ver-

batim copy of the article and allege its truth, a reference to the article being sufficient.  p. 125.

16.  CONTEMPT.—Reiteration in a verified answer of confession and avoidance of charges constituting contempt of court was not a further contempt, and a conviction based on such reiteration was error.  p. 125.

From Delaware Circuit Court; *Clarence W. Dearth,* Judge.

George R. Dale was convicted on two charges of contempt of court, and he appeals.  *Affirmed in one case and reversed in the other.*

*Frank B. Jaqua* and *Moran & Gillespie,* for appellant.

*Arthur L. Gilliom* and *U. S. Lesh,* Attorneys-General, *Edward M. White,* Assistant Attorney-General and *Mrs. Edward Franklin White,* Deputy Attorney-General, for the State.

TRAVIS, J.—The appeals in these two cases are brought to reverse judgments of the Delaware Circuit Court by which appellant was fined $500, and imprisonment for ninety days ordered, in each of the two cases upon the charges of contempt of court.  In the case No. 24,319, contempt was charged because of the publication of an alleged defamatory article by the appellant in a newspaper of general circulation which was edited, owned, and managed by him, and will be designated hereafter as the *first case.*  Appeal No. 24,310, hereinafter known as the *second case,* arose out of and is based upon the answer filed by appellant in the first case, which answer contained a verbatim copy of the alleged defamatory article which was the subject of the contempt in the first case.  The subject of the alleged defamatory article was concerning an indictment which had just been returned by the grand jury to the court, and which indictment charged appellant with having committed a crime.  This indictment was at the

time of the publication of the alleged defamatory article pending in the Delaware Circuit Court. The article was an attack upon the jury commissioners, the grand jury which returned the indictment, which grand jury had not been discharged, other officers of the court, and the presiding judge of the Delaware Circuit Court.

The alleged defamatory article as published in the first case and uttered in the second case in the answer, in both cases by the appellant, is as follows:

"KIMBROUGHS, NOTORIOUS BRIDGE GRAFT- ERS CONTROL AFFAIRS HERE.

"FRANKIE ON GUARD ON GRAND JURY, LLOYD ON THE BOARD OF SAFETY AND MARSH ON BOARD OF WORKS— FRAMED INDICTMENT AGAINST EDITOR OF POST-DEMOCRAT —DAMNABLE CONSPIR- ACY.

"Nobody in Muncie doubts for an instant that the framed up indictment the editor of the Post-Democrat is the natural sequence of the general conspiracy to discredit this newspaper and its publisher.

"We were indicted for being present in a law office in the Wysor block at the time the police visited the office with a search warrant charging the lawyer with the illegal possession of liquor.

"It is claimed that evidence was secured to prove the charge contained in the search warrant and a newspaper man who was in the office on business strictly in his line of reportorial duty was indicted on three counts charging him with manufacture, possession, barter, sale, and the giving away of intoxicating liquor.

"It is somewhat important to know, in this connection that out of the several hundred liquor cases in which the police have figured in the past year, this is the *first and only one presented to the grand jury for consideration.*

"On the second night following the framed up raid in the Wysor block the police raided and

searched a residence in Whitely where an admirer of the 'Honey Gal' vaudeville company was giving the men and women of the company a farewell dinner after the last show at the Star theatre.

"A pile of overcoats was searched and a half pint of liquor was found in the pocket of one of the performers.

"Instead of presenting that case to the grand jury the actor who owned the whisky called on Judge Coons the next morning, handed him one hundred and thirty dollars in the way of a fine, and the incident was closed.

"IF THE POLICE, PROSECUTOR AND GRAND JURY HAD BEEN STRICTLY ON THE LEVEL, PLAYING NO FAVORITES, PUNISHING NO ENEMIES AND TRYING TO TREAT ALL CITIZENS EXACTLY ALIKE, REGARDLESS OF THEIR PERSONAL OR POLITICAL FEELINGS, THE GRAND JURY WOULD HAVE HAD THE WHITELY CASE AND EVERY PERSON WHO WAS IN THE HOUSE WHEN THE POLICE SEARCHED IT AND FOUND LIQUOR SHOULD HAVE BEEN INDICTED ON THREE COUNTS, CHARGING MANUFACTURE, SALE AND POSSESSION OF INTOXICATING LIQUOR.

"In the Wysor block raid no liquor was found, but an empty bottle was found on the floor by a desk, by the feet of Court Asher, a notorious bootlegger and booze hauler who has been openly operating here for several months, with official protection, which was obtained by him by the Ku Klux Klan after he had joined that organization.

"At the time Asher's overcoat was hanging over a bookcase and the pocket contained a pint of bonded whisky and in another pocket was a revolver. No attempt was made by the police to search Asher or his coat, although he was the only one in the room known to be a violator of the liquor laws.

"THE NEXT DAY THE CASE WAS PRESENTED TO THE GRAND JURY AND THE FOUR MEN IN THE OFFICE, INCLUDING ASHER, WERE INDICTED ON THREE COUNTS, BUT ASHER, ALONE OF THE FOUR, WAS SUBPOENED AS A WITNESS AND PER-

MITTED TO TESTIFY BEFORE THE GRAND JURY CONCERNING THE CASE, ASHER WAS INDICTED THE SAME AS THE OTHERS, BUT IT WAS DONE BY THE PROSECUTOR AND GRAND JURY WITH THE FULL KNOWLEDGE THAT HE WAS RENDERED IMMUNE BY SO TESTIFYING IN HIS OWN CASE, AND THAT THE INDICTMENT AGAINST HIM IS UTTERLY WORTHLESS, EXCEPT FOR THE ORNAMENTAL PURPOSE OF MAKING IT APPEAR THAT · THE CASE WAS BEING PUSHED AGAINST HIM, TRUSTING THAT THE SUPPOSED IGNORANCE AND CREDULITY OF THE PUBLIC WOULD PREVENT THEM FROM UNDERSTANDING JUST WHAT KIND OF A CROOKED DEAL WAS PULLED OFF.

"As ·to the grand jury itself, its guiding spirit is Frank Kimbrough, whose family became wealthy through pulling off crooked bridge contract deals by corrupting city and county officials in various parts of the country.

"Lloyd Kimbrough, a brother of the celebrated grand juror, is president of the board of safety, and is now very much concerned in securing a pardon for his brother-in-law, Xene Smith, serving time in Michigan prison now for murdering a foreigner from whom he had purchased twenty gallons of white mule, and thought it was cheaper to waylay him along the road and kill him and steal the whisky than to pay him for it.

"FRANK KIMBROUGH WAS CAREFULLY SELECTED FOR GRAND JURY SERVICE BY JUDGE DEARTH'S KU KLUX JURY COMMISSION, JOHN HAMPTON AND FRANK KAVANAUGH, IN ORDER THAT THE GRAND JURY MIGHT PROPERLY COLLABORATE WITH LLOYD KIMBROUGH PERSONALLY CONDUCTED KU KLUX POLICE DEPARTMENT.

"WALTER D. WHITE, OFFICIAL SHORTHAND REPORTER AND SECRETARY OF THE GRAND JURY, IS A SON OF WILL WHITE, WHO IS ALSO A MEMBER OF THE BOARD OF SAFETY. EVERYTHING IS CAREFULLY SAFEGUARDED BY THIS TICKLE ME AND I'LL TICKLE YOU SYSTEM AND THERE IS NO

DANGER OF THINGS GOING ON IN THE GRAND JURY ROOM THAT WOULD BE UNPLEASANT FOR THE POLICE DEPARTMENT. AND LIKEWISE IF THE POLICE DEPARTMENT WANTS A CROOKED DEAL PUT OVER LIKE THE FRAMED UP INDICTMENT AGAINST THE EDITOR OF THE POST-DEMOCRAT, LITTLE FRANKY, THE DEGENERATE DESCENDANT OF THE PATRIARCHAL BRIDGE THIEF, WHO GRAFTED EVERY DOLLAR HE OWNS, IS RIGHT THERE ON DECK TO HELP PUT IT OVER.

"The Kimbroughs and Karl Oesterle, all members of the Ku Klux Klan, have been running the Quick administration. They have finally run it in the ground. The thieving bridge trust has its nose in every department. Doc. Quick having been taken by the ear by old Kimbrough, the boss bridge grafter, and forced to fill his departments by men named by him and Oesterle.

"The bridge trust is now directly represented on the board of safety by Lloyd Kimbrough, on the grand jury by Frank Kimbrough and on the board of works by J. R. Marsh, an office employee at the bridge works.

"Those who know the Kimbroughs and who are possessed of the knowledge that their rotten money has been amassed through fraud, corruption, bribery and graft, have reason to be disgusted with a mayor and an administration which stands for their domination.

"PLACING MEN ON GRAND JURIES AND ON BOARDS OF SAFETY WHOSE WEALTH WAS OBTAINED THROUGH CRIMINAL METHODS, IS ON LINE WITH THE ACTION OF JUDGE DEARTH IN NAMING SUCH MEN AS JOHN HAMPTON AND FRANK KAVANAUGH JURY COMMISSIONERS WHICH EMPOWERS THEM TO PACK JURORS AS THEIR MASTERS ORDER."

Both of the cases were briefed together and argued orally together, and both are now disposed of in this opinion. In the first case, error is predicated upon the ruling of the trial court overruling appellant's mo-

tion for a change of venue from the judge, and that the finding of the court is not sustained by sufficient evidence, and is contrary to law.

For convenience in distinguishing contempts of court, different classifications have been made, one as to whether contempts are civil or criminal in 1, 2. their nature, and the other as to whether they are direct or constructive (indirect). The alleged defamatory article which was published in the newspaper was directed against the dignity and authority of the court through its officers, and is plainly within the classification of criminal contempts. Any contempt of court, whether it be direct or constructive, which makes an attack upon the integrity of the court or an attack upon its officers, which attack hinders and delays the operation of the court with a case or cases then pending in the court, or which act is in disrespect of the court, or tends to obstruct the administration of justice by the court, or which tends to bring the court into disrepute, is a criminal contempt, and is subject to punitive punishment. The publication of the article here in question, if it be contemptuous, is clearly criminal in its nature.

In the classification of the contempt in the first case at bar, as to being direct or constructive, the line of demarkation is almost obliterated. Appellant 3. says in his brief and argument that the charge is for a constructive or an indirect contempt. In ordinary contemplation, an alleged contempt of court which is not in the immediate presence of the court is a constructive contempt, and must be presented to the court for its action upon the information of someone who knows of the contemptuous action. Anything done that brought the court into disrepute or that was a libel upon the court or that hindered it in the transaction of its business, if not done in the immediate

presence of the court, was generally considered and classified as a constructive contempt. The courts have not held strictly to this broad and definite classification. One who makes a personal attack upon the body of the judge of the court during an intermission and outside of the court room, the court being then in session, is guilty of a contempt of court, which has been held to be a direct contempt. *Ex parte McCown* (1905), 139 N. C. 95, 51 S. E. 957, 2 L. R. A. (N. S.) 603.

It has been held that one who writes a defamatory letter to the court is guilty of a direct contempt, although such letter was not delivered personally by the writer, nor was the letter written within the presence of the court. *United States* v. *Huff* (1913), 206 Fed. 700. Although newspaper articles which have been judged contemptuous were not written or published or printed within the actual presence of the court, nevertheless, in frequent cases, such newspaper publications have been held to be direct contempts of the court upon which attacks were made. Some of the cases concerning newspaper publications have gone to the extent that such publications were held to be direct contempts even though the cities where the publications were made, and which cities are the homes of the newspapers were at great distances from the seat of the court. *Myers* v. *State* (1889), 46 Ohio 473, 22 N. E. 43, 15 Am. St. 638; *State* v. *Frew* (1884), 24 W. Va. 416, 49 Am. Rep. 257; *People* v. *Wilson* (1872), 64 Ill. 195, 211, 16 Am. Rep. 528.

Anticipating the objection to some of the cases cited, that the determination of them was controlled by statutes, which contempts otherwise would have been 4-6. classified as constructive, it has been decided in this state that a grand jury by leaving its grand jury report for the court after the court had recessed for the end of the day, and which report was left for the

court, not in the presence of the judge, and the grand jury had returned to their homes, the action of leaving such grand jury report to be filed, was adjudged to be a direct contempt. *Coons* v. *State* (1922), 191 Ind. 580, 134 N. E. 194. The published article here in question was not written or published for a purpose laudatory to the court, or to bring it into higher repute than it then was. But no matter how feeble the utterances made by the article may be claimed to be by appellant, nevertheless it is plainly apparent that the very conception of this article was defamatory, degrading, libelous, debasing of the character of the court, the judge thereof, the jury commissioners who were appointed by the court, and the grand jury itself, which was a part of the court, and also the prosecuting attorney. The article also was concerning a criminal case then pending before the court upon an indictment which charged a felony, which indictment had been returned by the grand jury, which was referred to in the contemptuous publication. If the published article were to have the force that may be inferred was the intention of the writer to put into it, one of its purposes was to put the grand jury in fear and thus hinder the due process of the court in carrying on its business in the interests of the people through its direct instrumentalities. It may be contended that under the statute in this state, the only classification of this contempt is that it was constructive and without the presence of the court. The power of a court established by a constitution to take cognizance of contempts against it does not rest upon any act of the legislature. The right to recognize any action by any person which may wrongfully affect the court has been recognized as long as courts have been in existence as an inherent power. An act of the legislature which attempts to give power to a constitutional court to recognize contempts against it

and punish the contemnors is not a declaration of any new power, but merely a recognition of that broad power which the court has had from its inception. Appellant is seeking a right of change of venue from the judge in the first case, based upon a statute (§443 Burns 1926) which is in the words: "When any matter of a civil, statutory or equitable nature, not triable by jury, is pending, the judge before whom said cause is pending shall change the venue thereof upon the application of either party to said cause, made upon affidavit showing any one or more of the reasons named in the statutes of this state authorizing changes of venue from the judge in civil actions. And the presiding judge shall make an appointment of a special judge to hear such case in the manner provided by law for changes of venue in civil actions." The statute has to do with civil, statutory, and matters of an equitable nature not triable by a jury. It has been decided by this court as well as by the courts of other jurisdictions that a matter of a contempt of court is neither civil nor criminal, although it partakes of the nature of both. *State v. Newton* (1878), 62 Ind. 517, 520; *Township of Noble v. Aasen* (1901), 10 N. D. 264, 267. Neither is the proceeding of contempt in this state a statutory one. The recognition of contempts is inherent in the courts, and the courts have from their inception provided the procedure. The statutes in relation to what are contempts, and the procedure, are nothing more or less than a recognition of the inherent rights of a court which had long been upheld by the courts, as well as by the people, as shown by the adoption of new constitutions in the different states. Had the people been dissatisfied with such inherent right within the court itself after having passed through years of operation, it is plain that such power which originated as inherent in the courts, would have been limited or abolished altogether

by the new constitutions. The statute in question does not afford the right of change of venue in cases for contempts of court. It has been the general rule that contempts of the court have been dealt with by the court and judge against which such contempt has been directed. Although this is held not to be a civil contempt, it is the invariable rule that it is for the court which made the order in an equitable proceeding to punish for contempt of the court based upon a refusal to obey or comply with the order made by the court.

It has been argued heretofore in various jurisdictions that a contempt in the classification as a criminal contempt is a criminal case. But the courts have never adopted this conclusion. The courts have uniformly held that a criminal contempt is not a criminal case even though the act that is held to be contemptuous was itself an act made criminal by statute. The courts have gone so far in this direction that it has been held that one may not only be fined and imprisoned for contempt for a certain contemptuous act, but that he may be also charged with the commission of a statutory crime in an indictment for the same act, and the finding or verdict in such a case is not contrary to law, after having been found guilty of contempt, because of former jeopardy. It may not be successfully denied that the trial and punishment for a direct contempt is entirely summary, which necessarily implies that the court acts upon the instant in pronouncing the punishment upon such an offender. The law recognizes no excuse why a change of venue ought to be granted from the presiding judge in such a summary proceeding. Much has been written that this power which resides in the court may be abused and is liable to become arbitrary, yet the courts have consistently held that this is no reason why the power to punish for contempt should not exist. And the few

instances in which this power has been used by the court show that it has been wisely placed and that it may be safely left entirely in the hands of the courts. We have heretofore held that the cases at bar are criminal contempts, and also that direct contempts of the court are tried by the court and the judge thereof summarily. But it is well recognized as now settled that criminal contempts of the courts as well as direct contempts are to be tried summarily by the court. The interference in the long established practice of the court in trying such cases summarily would be violent, should the change be made to the regular course and way of procedure as followed in the ordinary civil or criminal cases, in which the cases of contempt would be subject not only to removal from the judge by a change of venue, but to removal from the county; also subject to delay in the trial usually accorded to parties in civil actions. Were the change to be made to civil procedure to any extent, the courts would lose that power so long recognized to preserve the dignity of the court and the good name thereof. *Merchants S. & G. Co.* v. *Board of Trade of Chicago* (1912), 201 Fed. 20, 25, 120 C. C. A. 582, 589; *State* v. *Frew, supra.*

Appellant further maintains that if the contempt in the first case be considered one of criminal contempt, then by analogy of reasoning the appellant was entitled to a change of venue demanded under the provisions of §2235 Burns 1926. The section of the statutes cited by appellant has to do with criminal cases solely. The first case at bar, although it partakes of the nature of a criminal case, is not a criminal case, as contemplated by the statute in question or the criminal law of this state. The Supreme Court of Illinois has held that a change of venue provided for by statute in cases of criminal informations

does not apply to informations for contempts of court. *Crook* v. *People* (1855), 16 Ill. 534.

The court holds that the appellant was not entitled to a change of venue from the judge in the first case, No. 24,319.

Concerning the merits of the said contemptuous article published in the newspaper, appellant contends that such article does not contain any statements that are contemptuous, and to so hold would be to destroy the freedom of the press, by reason of which the finding is not sustained by sufficient evidence and is contrary to law.

Appellant further contends that the article is not contemptuous *per se,* but could only have been believed contemptuous by misconstruction of its language through innuendo, from which it must follow that he has entirely purged himself of the contempt charged by his verified answer which disavowed any intended disrespect to the court or any of its instrumentalities in the business of the court. The meaning and intent of an alleged contemptuous article published in a newspaper are to be determined by a fair interpretation of the language used, which determination is a matter of law for the court to determine as to whether or not such published statement is contemptuous *per se* or whether only such contempt follows through innuendoes from such published statement. A disclaimer by verified answer of any general or special disrespect to the court or of an intended interference with the administration and business of the court is not sufficient to purge one charged with contempt where the contemptuous intent is plain from the letter of the alleged contemptuous published article. *Ray* v. *State* (1917), 186 Ind. 396, 114 N. E. 866; *People* v. *Wilson, supra.* The contemptuous article under consideration at

bar was published with the intention to hinder and obstruct the administration of justice and to discredit the court, and to cause any and all who read the article to hold the court in contempt, which is plainly seen from its context.    The constitutional guarantee of freedom of the press is not infringed by the summary process for contempt of court, and a conviction thereunder based upon publications which tend to obstruct the administration of justice. *United States* v. *Toledo Newspaper Co.* (1915), 220 Fed. 458.    This case was affirmed 237 Fed. 986, 150 C. C. A. 636.    Appellant says by his answer that the statements made in the alleged contemptuous article are true, but that no contempt of the court was intended in the publication of such true statements.    It is not a justification for contempt such that will purge one of the charge, even though it be shown that the article published was true, if it in any way hindered the orderly process of the court and brought it into contempt before the people.    It is no excuse for one charged with criminal contempt predicated upon an article published in a newspaper, that the article in all respects was true, where the article tends to prejudice the court in a case then pending, and hold the court in contempt before the people.    The basis of a criminal contempt by speech or published article is the words of such speech or article as judicially interpreted. If the language used, as ordinarily and fairly interpreted, tends to degrade the court and embarrass it in the consideration of a pending case, the only issue is whether the words or article was actually spoken or published.    The truth of the article is not a matter of defense, neither is it a defense to show that there was no intent to commit a contempt.    Such answer is insufficient to purge the contemnor of guilt. *Globe Newspaper* v. *Commonwealth* (1905), 188 Mass. 449, 74 N. E. 682, 3 Ann. Cas. 761; 6 R. C. L. §20, p. 509; *Hughes*

v. *Territory* (1906), 10 Ariz. 119, 85 Pac. 1058, 6 L. R. A. (N. S.) 572; *People* v. *News-Times Pub. Co.* (1906), 35 Colo. 253, 84 Pac. 912; *People* v. *Wilson*, *supra*. If the alleged contemptuous article, directly or indirectly, tended to bring the court into disrepute, or tended to hinder it in the administration of its judicial proceedings in cases then pending before it, which is the vital question, it was contemptuous, and the writing and publishing of the article being admitted by appellant, the offense is established.

The second case is based upon the answer filed in the first case, which answer contained a verbatim copy of the alleged contemptuous article, upon which was based the further allegation that the statements made in the published article were true, but that no offense to the court was intended, neither was it the intention of the writer to impede or hinder the process of the court. Appellant maintains that the answer, with these allegations of confession and avoidance, is sufficient to purge himself of contempt in the first case. It was unnecessary to set out the alleged contemptuous article in the answer which was filed in the first case, in order to make the further allegations, that appellant had no intent to bring the court into contempt or interfere with or obstruct the orderly proceeding of its judicial business; the alleged contemptuous article might have been brought into the answer by reference only. Had this been done, instead of quoting it in full in the answer filed to the charge in the first case, there would have been no ground for the contempt of court charged in the second case. The repetition by appellant of the published article in his answer was not for the purpose of a further contempt, but was repeated as a basis for the further allegations in his answer. We believe it ought not to be considered in the category of contempts based upon pleadings, generally, or briefs

where the statement made upon which the contempt is alleged is an original statement, and was unnecessary either as a part of the pleading or in the brief as bearing upon the reasoning of the party in support of the proposition upon the error under review.   The reiteration of the article in the answer in the case at bar was because of such reiteration not an original and further contempt; but if any value were to be placed upon it, instead of being a mitigation, it would be an aggravation of the original contempt by publication, concerning which we do not decide and it is unnecessary to decide here that it formed a basis for punishment greater than would have otherwise been meted out to appellant.   After a finding of guilty of contempt in the second case and judgment which imposed a fine of $500 and imprisonment of ninety days, appellant made his motion to the court to reconsider its opinion and judgment, which the court overruled, and which ruling the appellant alleged as error.   Inasmuch as the second case was one of direct contempt and all the matters relating to it are of record and before this court, we find that upon a reconsideration of the opinion and judgment of the lower court, the court should have found the appellant not guilty of contempt, and judgment accordingly.   It is hereby ordered that the Delaware Circuit Court reconsider its opinion and judgment upon appellant's motion and make its finding that the appellant is not guilty of the contempt charged in cause No. 24,310, and enter judgment upon the finding.

Judgment in the case No. 24,319 is affirmed.   Judgment in the case No. 24,310 is reversed, with instructions.