SULLENS *v.* STATE.

(In Banc.   Nov. 10, 1941.)

[4 So. (2d) 356.   No. 34822.]

Watkins & Eager, of Jackson, for appellant.

**Greek L. Rice**, Attorney-General, by **Geo. H. Ethridge**, Assistant Attorney-General, for appellee.

Argued orally by **W. H. Watkins**, for appellant, and by **George H. Ethridge**, for appellee.

**Alexander, J.,** delivered the opinion of the court.

Appellant was, after information filed and upon proper citation, adjudged in constructive contempt of court and sentence imposed. The citation was based upon two newspaper publications written by appellant in the Jackson Daily News of which he is the editor. These publications were as follows: "That's a good show now being staged in the Hinds County circuit court room. Of course, some of the roles are unpleasant and rather poorly performed, but it is a good show nevertheless. On the stage or screen it would be well worth a price of admission. This suggests the idea that our statutes ought to provide an admission fee for court rooms when big human dramas are being staged. It would help a lot in defraying court expenses." This article was published June 10, 1941.

The second article published Sunday, June 15, 1941, was as follows: "This is a law-abiding county (An Editorial) 'The mountain labored and brought forth a mouse.'

"The criminal term of the Hinds county circuit court has adjourned and Judge Jeptha Barbour's widely-publicized moral crusade against liquor selling and gambling is at an end—for the present, at least.

"There was much beating of tom-toms and sounding of loud alarm, but the net results were exceedingly small.

"Hinds county will furnish only one new prisoner for the county farm and none of our so-called 'big-shots' are going to help with the cotton crop up at the Parchman farm.

"A small group of the small fry, mostly negro workers at night clubs, were given fines of $100 each.

"The list of indictments returned was not greater than that of the average criminal court term, and the number of convictions was smaller than at former terms.

"So it would seem that, in spite of the great volume of smoke, there was very little fire beneath—much noise, but no casualty list of consequence; much talk about no-

torious lack of law-enforcement in our county, but mighty little proof thereof.

"All of this, of course, is unfortunate from any point of view.

"An overwhelming majority of the people of Hinds county believe in orderly government and the proper enforcement of written statutes, but they are indignant and righteously resentful when an utterly false and exaggerated impression is created in the public mind that a saturnalia of crime flourished in the most important county of the state.

"They do not believe, and they have not yet been furnished with reasons to believe, that such shocking conditions exist here, and until furnished with proof more positive than that offered at the recent Hinds county court term, they are justified in making emphatic denial.

"More than that, our citizens have complete faith and unshaken confidence in the officers chosen by them for the work of law enforcement.

"They do not believe, and have no good reason to believe, that Sheriff Frank Scott and the staff of efficient deputies chosen by him for maintenance of law and order have been negligent in their duties, or that they are in league with lawbreakers, yet that impression might easily be created in the outside world after all that has been recently printed and bruited about on the street corners.

"On the contrary, the observant and intelligent citizens of Hinds county are emphatic in their belief that they have a capable, courageous and energetic corps of officers who enforce the laws with as much thoroughness as it is humanly possible to do and they regard it as not only unfortunate, but derogatory to the good name of our county and its citizenry that an impression to the contrary has been created in recent weeks.

"The Hinds grand jury empanelled at the beginning of the recent term was composed of a group of citizens of a high standard of intelligence and integrity. Not a finer panel could have been found in the county. The

jury worked diligently and faithfully, making a thorough investigation of conditions in the county, and at the conclusion of its labors made a report praising Sheriff Scott and his staff for 'tireless and effective efforts' in behalf of law enforcement.

"The citizens of the county believe that was an accurate report and they accept it as such. They believe it in preference to any statements emanating from other sources. They surely give it credence above dirt-spilling by certain persons who have heretofore been discredited in the courts and shown to be persons unworthy of belief.

"Hinds county does not claim perfection. We have the average number of sinners in our midst, but no more than the average. We have had in the past a character of law enforcement as good as that of any other county in the commonwealth. That is conclusively proven by the large number of indictments at court terms in former years when Judges W. A. Henry, Wiley Potter and Julian Alexander presided over our court terms.

"Hinds is a large county—large in population and territorial extent. With law enforcement lax in our city and county during the era of remarkable growth it would have been comparatively easy to establish a lawless gang rule here, with organized crime of all sorts flourishing, but it hasn't happened. We have had but little in the way of major crimes and the calendar of minor crimes and misdemeanors has not been large enough to justify any sort of alarm or pointing the finger of scorn in our direction.

"In brief, the people of Hinds county still have faith in their own standard of decency, faith in their government, and faith in their law-enforcement agencies. They have never expected absolute perfection, because they know that it is impossible, and they will continue to pursue the even tenor of their ways as though that court term had never happened, but they want the world to know that they didn't like an impression to go out to the world that their county is a hotbed of crime and that

liquor joints and gambling dens and other places of iniquity flourish here like the proverbial green bay tree. They know that simply isn't true, and they find it hard to understand what all the shooting was about at the recent court term."

The information as filed alleged that such articles "were intended to and calculated to, and did reflect on the dignity of the court, and did impede and hinder and embarrass the proper functioning of the court in its efforts to enforce the laws of the State of Mississippi, and brought the court into contempt and reflected on the court in such a way as to create a contempt . . ."

The question presented therefore is whether the publication of these articles constituted a constructive contempt of the court "while sitting," adjudged in the light of the circumstances attending their publication. These circumstances are as follows: the May, 1941, term of the circuit court of the first district of Hinds county convened on the first Monday in May. On that day the grand jury was empanelled and charged. The record discloses that the learned trial judge delivered a vigorous charge denouncing the alleged prevalence of crime in the county, especially charging that gambling and the unlawful sale of intoxicating liquors were open and notorious and conducted flagrantly and defiantly. The judge not only demanded a thorough and courageous investigation of such crimes but stated that he would not discharge the body unless and until he felt that they had thoroughly examined these matters. A large number of indictments were thereafter returned by the grand jury and it was adjourned May 15th. Photographs were made in the court room of a large group of defendants under indictment. In the meantime, according to the statement by the trial judge, "After the Court had been in session the information came to me that these places had not closed; that they were more or less defiant of the Court, in disrespect of any authority or power the Court might have to enforce the liquor laws. A number of raids were made,

and some of the same defendants who were then under indictment were found with substantial quantities of liquor in their possession; sales made by some of the defendants who stood indicted before the Court. I thereupon recalled the grand jury and told them in a very few words and told them there were other matters, not referring to what those matters were. The grand jury retired and again faithfully and diligently and honestly performed their duty and returned additional indictments; and the total number of persons indicted at the two sittings was 174.'' The judge further stated that he had been informed of deliberate efforts to tamper with jurors. Citation was in fact issued against a party in connection with an attempt to bribe a juror, and this matter was heard. Conviction for contempt followed. In the court's charge to the grand jury criticism was made of the board of supervisors for their failure properly to prepare lists of prospective jurors for the jury box.

The grand jury was reconvened June 4, 1941, at which time the learned trial judge again denounced existing lawlessness, and in his charge he openly rebuked the sheriff, offering to furnish to him and his deputies names of persons who were daily violating the law as well as the names and photographs of the places where such violations occurred. Pursuant to an order of the judge the sheriff had all members of the board of supervisors brought before him, and according to an exhibit to the record ''all were lined up in front of Judge Barbour as he made his charge to the jury.'' The board was again specially rebuked for failure ''to have the registration books properly kept so that names drawn for jury service were available.'' The grand jury shortly thereafter made its final report returning additional indictments to a total of 174.

The exhibits further disclose that upon the report of a trial jury in a criminal case that they were unable to agree and the court declared a mistrial therein. Thereupon, the learned judge ascertained by inquiry of the

panel the names of four members of the jury who had voted for acquittal. These were severally questioned by the court as to their reasons for not voting conviction and he intimated that citation for contempt might follow, stating to one juror ''I will cite you for contempt'' and to the others ''I will handle you later.'' It was on the day following this incident that the first of the two published articles appeared.

The answer of appellant to the citation admitted the publication of the two articles but disavowed any intention to reflect upon the trial judge or to evince disrespect or to impede or embarrass the judge or the court in the performance of its duty and functions. The testimony and the exhibits, which comprised numerous newspaper reports of the court proceedings, reveals that the term of court was of unusual public interest and furnished many incidents ordinarily deemed noteworthy by the public press. That such developments may have been attributable to a commendable and courageous zeal of the trial judge or to a heightened efficiency of the court itself is not just here in point so much as are the facts themselves.

As to the first article quoted, it is not necessary to consider whether the court was then sitting or whether the publication referred to any pending cause, for the reason that when viewed through the lens of Section 13 of our Constitution and in the light of the spirit of Section 741, Code 1930, we cannot discover any germs of legal contempt nor detect any reasonable tendencies to obstruct, embarrass or hinder the court in the proper exercise of its functions.

At the time of the publication of the second article on Sunday, June 15th, the grand jury had finally adjourned. The only pending cases were those where indictments had been returned but in which no capiases thereon had been executed. On the minutes of the court for Friday, June 13th, there were two judgments against an attorney sus-

pending him from practice in separate cases, each containing the following identical recitals:

"It was the judgment of the Court that further action be held in abeyance until the last day of this term of Court and if the judgment was not satisfied by that day such further action warranted by section 3705 of the Code of 1930 could be had.

"It appearing that this judgment has not been satisfied on this the last day of this term of Court, it is the further judgment of the Court that the right of the defendant, . . . to practice law be suspended until this judgment is satisfied." On the front page of a morning contemporary, the Clarion-Ledger, dated the following day, it was announced that the court had finally adjourned. These circumstances supply the background against which we must examine the article of June 15th, both as to its inherent character and as to its justification should there be need therefor.

That the inherent power of courts at common law to punish summarily for constructive contempt was an unwarranted assumption has been vigorously asserted. Delolme, English Constitution (1771), Ch. XII; Sir John C. Fox, The History of Contempt of Court (1927); Edward Livingston, System of Penal Law prepared for the State of Louisiana (1764); Nelles and King, Contempt by Publication in the United States, 28 Col. Law Rev. 401, 524; Dangel, N. L. M. Contempt (1939), p. 208; Tucker's Blackstone, 108 and App. 405; State v. Coleman (Mo. Sup.), 152 S. W. (2d) 640; Patterson v. Colorado, 205 U. S. 454, 462, 27 S. Ct. 556, 51 L. Ed. 879, 10 Ann. Cas. 689. This view was also expressed in the nisi prius decision of Judge Thatcher in Ex parte Hickey, 4 Smedes & M. 751, 12 Miss. 751. We need not pursue the trend of later decisions in view of our acceptance of the view that such contempts are now subject to summary trial and punishment.

Section 741, Code 1930, without defining what constitutes contempt, provides that "The Supreme, circuit,

chancery, and county courts shall have power to fine and imprison any person guilty of contempt of the court while sitting . . ." Constructive contempt has been defined as "any act calculated to impede, embarrass, obstruct, defeat, or corrupt the administration of courts of justice, when the act is done beyond the presence of the court." Knox v. State, 160 Miss. 494, 135 So. 206, 207; similar definitions appear in Watson v. Williams, 36 Miss. 331; Shattuck v. State, 51 Miss. 50, 24 Am. Rep. 624; Durham v. State, 97 Miss. 549, 52 So. 627; Aarons v. State, 105 Miss. 402, 62 So. 419, Ann. Cas. 1916E, 263; Prine v. State, 143 Miss. 231, 108 So. 716, 717; Brewer v. State, 176 Miss. 803, 170 So. 540; City of Biloxi v. Lowery, 179 Miss. 364, 175 So. 200; Sammons v. State, 181 Miss. 45, 178 So. 596. Such acts are also indictable under Section 1062, Code 1930.

It was inevitable that there should be an ever recurring necessity for courts to referee the clashes between the right of our courts to freedom from interference or obstruction and the right of the citizen to freedom of speech. Courts are established by governments and our government in turn was instituted among men to secure certain unalienable rights with which they were "endowed by their Creator." The Constitution of the United States was ordained to "secure the blessings of liberty to ourselves and to our posterity." Among these unalienable rights is the freedom of speech and of the press. U. S. Constitution, Amendment Art. 1; Miss. Constitution 1890, Sec. 13. In both the State and Federal Constitutions these rights are recognized as pre-existing and the provisions therein are against abridgment or restraint, even as Magna Charta secured liberty to the people by imposing restraint upon the king. It is not a postulate of democracy that the truth shall make men free; rather it is the right to know the truth that keeps them so. Thus courts become one of the means to the end that such rights may be protected. This freedom is declared to be sacred to the people and being one of the distinguishing

features of a democratic state is naturally the first to be destroyed by totalitarian states in their campaign for enslavement through dictatorship. Even those who affect to despise this liberty flee at once to the temple of democracy to seek sanctuary against punishment for their sedition. Cf. Gitlow v. People of State of New York, 268 U. S. 652, 45 S. Ct. 625, 69 L. Ed. 1138. Both the sword of this freedom and the shield of the courts must constitute the equipment of those whose eternal vigilance must be invoked to preserve liberty. Since the courts may not suppress this freedom neither may it in turn be exercised to impair the power of the courts to protect it. In conforming these two principles so as to accommodate each to the other as foundation sills of our governmental structure it was anticipated that each would, in being mitered to a snug adjustment, suffer some impairment.

Both the court and the citizen must enjoy immunity from mutual interference. In steering with assurance against conflicting currents the courts must pull each oar with even stress lest an errant course be laid. Yet to offset any tendency to drift with the tides of restraint the oar of freedom should be held in the stronger hand. In doubtful cases, the right to restrain should yield. See Cheadle v. State, 110 Ind. 301, 311, 11 N. E. 426, 59 Am. St. Rep. 199. Cf. Ex parte Redmond, 159 Miss. 449, 132 So. 328. The right to speak may never include the right to destroy or impair thereby that which protects such right, for the right to speak is inseparable from the duty to respect. It is in the attempt to define the respective areas of these freedoms that the courts themselves have met difficulty. See Schaeffer v. United States, 251 U. S. 466, 474, 40 S. Ct. 259, 64 L. Ed. 360. The freedom of speech and of the press is confined within a generous arena, yet it is bounded by definite limitations. It must stop short, for example, of libel, treason or blasphemy; nor may it be used in the abetting of any crime against the state which conserves it. The right of the court to enforce respect for itself begins where the right of the

citizen to speak ends. This line, difficult of abstract definition, is fixed at that point where that which is spoken or published is calculated to obstruct the functioning processes of the court or to impede or impair the efficiency of its machinery then in motion. It is immaterial whether the obstruction is by force, insult, persuasion or disobedience; whether committed by act or word; or whether it affects the judge, the grand or petit jury, or any persons made part of its personnel by its process. In Sammons v. State, supra, it was held contempt to seek to influence witnesses under subpoena, while in Sellers v. State, 127 Miss. 748, 90 So. 716, 21 A. L. R. 238, it was held not contempt to influence those not under such process.

The test is not actual obstruction, else scrutiny would in each case be directed toward the degree to which the act was successful rather than to the degree to which it was contemptuous. Again, it must not rest upon the existence of a contemptuous intent, else one is left to adjudge his own liability which would be referable not to the contumacy of the publication but the ability of the contemnor to appreciate it as such. We have heretofore recognized that the dignity of the court, growing out of both its right to demand, and the duty of the citizen to accord respect, is a necessary adjunct to its administration of justice, and that any demeaning thereof to the impairment of its functioning is a contempt. Hanna v. State, 169 Miss. 314, 153 So. 371.

Freedom of speech includes the freedom to speak unwisdom or even heresy. Others may despise the speech but they may not despise the freedom. The citizen has the constitutional right to be vulgar. Our devotion to free speech bespeaks a confidence that truth will prevail over error and that it can take care of itself in any crowd of baser thoughts. Error may safely be abandoned to fight its own way against the ruthless buffeting of public opinion, in the assurance that it will ultimately succumb to the ravages of reason. To this end minds may not be

conscripted. We must not allow ourselves by repeated exposure to trans-atlantic ideas to build up an immunity which desensitizes us to pain or distress at any attack upon the proper exercise of the right to liberty of the press. Yet the freedom must not be excessive, nor must our devotion thereto become fanatic. The Constitution has both sail and anchor. The area of its permissible function must be circumscribed to accommodate itself to the correlative rights of others. These latter fix the length of the leash by which each citizen is restricted within his own circle of independent action. When one functioning within the circle of free speech runs out thoughtlessly to the full length of his tether he is apt to be brought up abruptly to his discomfiture, to find himself entangled amid the brambles of bad taste which fringe the border lines of discretion. Against such there is no law. Where the courts can not compel they can not condemn. If conduct contravenes mere propriety, others in the exercise of the same unalienable right remain free to counterattack with the weapons of scorn or indifference, leaving indiscretion to be picketed with the placards of public opinion. It may be that in the printed articles appellant made taut the limiting leash but we can not say that it has loosed its hold. Within these limitations the citizen may reasonably criticize even the courts or the judges thereof. The exercise of this right may embarrass the particular functionary; it may depreciate the effectiveness of our legal procedure, yet so long as it pulls up short of the obstruction or impedance of the machinery of the court then in motion, it is free from interference by the courts. Blind justice symbolizing the authority and dignity of the courts may be railed against behind her back or may be derided as to defects in her gait or posture but her hand or tongue may not be stayed nor her course impeded. Constructive contempt in legal definition is not an abstraction, it must subvert justice. Nixon v. State, 207 Ind. 426, 193 N. E. 591, 97 A. L. R. 894; Globe Newspaper Co. v. Com., 188 Mass. 449, 74 N. E.

682, 3 Ann. Cas. 761; Dale v. State, 198 Ind. 110, 150 N. E. 781, 49 A. L. R. 647, writ of error dismissed, 273 U. S. 776, 47 S. Ct. 332, 71 L. Ed. 886; Telegram Newspaper Co. v. Com., 172 Mass. 294, 52 N. E. 445, 44 L. R. A. 159, 70 Am. St. Rep. 280; 17 C. J. S., Contempt, Sec. 30, p. 41. Independence of the judiciary implies an independence against criticism as well as an assumption that against any assault upon its will to do justice it will remain unmoved. Indeed it is conceivable that in some rare case a timely criticism may advance the cause of justice by challenging a waning impartiality and stimulating it to a dependable rigidity. Cheadle v. State, supra.

The article of June 15th, good faith being conceded, could reasonably be construed as defensive of the morals of the county and the efficiency of its officials. It could readily be held to imply not that the mills of justice had ground ineffectively but that on the contrary there was little grist to grind. One may critize the court as inefficient so long as he does not contribute to its inefficiency.

Constructive contempt by publication is not restricted in its definition by a requirement that it refer to a pending case. Such may indeed furnish not only a typical illustration of its application but also the inciting occasion for its manifestation. Yet to so confine the definition is to disregard the obvious truth that the machinery of the court may be so crippled by contemptuousness that there may be found no causes pending. Fishback v. State, 131 Ind. 304, 30 N. E. 1088; Allen v. State, 131 Ind. 599, 30 N. E. 1093; Com. v. Chmielinski, 246 Mass. 55, 140 N. E. 258.

We are not unmindful of the extent to which the full exercise of the freedom of the press may on occasion tend to embarrass a trial judge in the discharge of one of the most difficult, exacting and important public duties. Nor are we out of sympathy with the learned trial judge in the salutary objects which he sought to attain and the zeal and courage with which he pursued his purpose. The two writings here involved must be adjudged in the light

both of their text and their context. When viewed in both aspects we do not discover in them the ingredients of constructive contempt. That we may not condemn them does not imply, however, that we must condone them. In our conclusion we have not put out of view the circumstance that the court itself indicated upon its minutes that after Friday, June 13th, the court would be no longer sitting and that its functions as a court would cease.

Reversed and appellant discharged.

SPECIALLY CONCURRING OPINION.

**Smith, C. J.,** delivered a specially concurring opinion.

I concur in all that Judge ALEXANDER, in speaking for the court, has here said, and what I shall now say is merely supplementary thereto.

In calling attention to the acts and utterances of the circuit judge set forth in the publications here under consideration, the appellant was attempting to discharge a duty that he owed the public as the editor of a newspaper. Since the adoption of our constitutional guaranties of freedom of speech and of the press, American newspapers in response to public demand therefor has assumed the duty of giving the people full information of the conduct of public officials, including the judges of all courts. Such information is necessary in a Democracy in order to insure the observance of its processes. "Star Chamber proceedings or secrecy in the administration of justice is provocative of injustice and tyranny. The people have a right to know how its judicial, as well as its executive officers, perform their duty, and publicity of the acts and doings of court officials serves as a material factor in keeping the stream of justice unpolluted." Patterson's "Free Speech and a Free Press," p. 151. The discharge of this duty was here particularly incumbent upon the appellant, because of the threat made by the judge to jurors who had voted for an acquittal in a criminal case to cite them for contempt of court.

Since Bushel's case, 6 How. St. Tr. 999, 124 Eng. Reprint 1006, decided in 1670, the jury has had the right "to return a verdict according to their own consciences . . . without being ·subjected in respect of it to any penal consequences." 1 Steven's Hist. of Crim. Law, 307; 9 Holdsworth's Hist. of Eng. Law, 231; Thayer's Preliminary Treatise on Evidence, 166; In re William J. Cochran, 237 N. Y. 336, 143 N. E. 212, 32 A. L. R. 433. It may be that some of the language used in these publications lacks dignity, is not altogether in good taste, and, without necessity therefor, was calculated to wound the feelings of the judge who, we must assume, was discharging what he conceived to be his official duty when doing and saying the things criticized; nevertheless, it is not within the orbit of a summary proceeding for contempt of court.