CUMMINGS *v.* STATE.

(In Banc. Jan. 25, 1943.)

[11 So. (2d) 683. No. 35155.]

60

SMITH, C. J., and ALEXANDER and ANDERSON, JJ., dissenting.

G. C. Clark, of Waynesboro, Grover C. Powell, of Atlanta, Ga., and Hayden C. Covington, of Brooklyn, N. Y., for appellant.

Greek L. Rice, Attorney-General, by Geo. H. Ethridge, Assistant Attorney-General, for appellee.

Roberds, J., delivered the opinion of the court.

This case is controlled by the opinion this day handed down in the case of Taylor v. State, 194 Miss. 1, 11 So. (2d) 663.

We desire to again emphasize, as we tried to emphasize in that case, that the Mississippi statute does not attempt to coerce, control or direct, in the slightest degree, the conscience or religious beliefs of any person. So far as that statute is concerned, one may believe in and worship a Divine Being, or any ideal or thing the worshiper may think divine, under the name of Jehovah, or any other name; or, on the other hand, he is free to worship satan, a golden calf, any animal or thing, or any image of anything, real or imaginary. What the statute

does prohibit is the going about into the homes and among the people, and, by affirmative teaching and action, attempting to persuade the people, at this tragic time, to have disrespect for and disloyalty towards the flag and the state and the nation, and to evince an attitude of disobedience to the laws of the land, thereby undermining the war efforts of the state and national governments. The statute does not command any one to salute the flag or do anything else; it simply demands that people shall not engage in certain affirmative activities which the sovereign state, through its legislature, has determined are harmful to other people and to the public welfare and to the defensive war efforts of the state and nation.

Appellant was indicted for doing the things prohibited by the statute, and the jury found on sufficient evidence that he did them.

Affirmed.

**Griffith, J.**, delivered a concurring opinion.

Teaching that to salute the national flag is an act of idolatry, and that the consequences of such an act is eternal damnation, is a pointed symptom of the disease which lies at the bottom of the subversive and destructive doctrines which this appellant and his co-workers are seeking to spread in our state in this time of war, the result of which means everything to us as a state and nation. We must look behind technical obscurities and to the substance of things. If appellant may maintain the right so to teach among the civilian population, he has the same right to teach it and urge it among the soldiers and marines wherever access may be had to them; and if our soldiers were to refuse to salute the flag wherever unfurled, and particularly when the military regulations require them to do so, then we would have an army and a navy which would be entitled to no respect at home or

abroad; and whoever teaches that which, if followed, would bring our armed forces into such disrespect ought well to be in the penitentiary, as the statute appropriately declares.

**Alexander, J.**, delivered a dissenting opinion.

Appellant was convicted under an indictment which charged him with distributing a book entitled "Children" which it was alleged "reasonably tended to create an attitude of stubborn refusal to salute, honor or respect the flag or Government of the United States or of the State of Mississippi." The statute under which it is drawn is Chapter 178, Laws of 1942, which is set forth in the controlling opinion in the companion case of Taylor v. State, 194 Miss. 1, 11 So. (2d) 663, decided this day. The evidence was restricted to and the conviction based upon the alleged teaching that members of the sect to which appellant belonged could not, consistently with their beliefs, perform the ceremony of a salute to the flag. To one unsympathetic with the mysticism of its creed, it can, and perhaps often is, divested of its religious aspect and thereupon attacked as mere subtle political propaganda. The record does not justify a conclusion that appellant's adherence to its teachings, whether blind or rational, was not sincere. It is clear that the advocacy of the doctrine of non-salute is allegedly based upon an interpretation of scripture. The book was written long before this Nation entered the present war. Both the book and the appellant himself, while professing allegiance to and respect for the flag, conceded the right of nonadherents to follow their own convictions. A careful reading of this book fails to impress me that it teaches dishonor to the flag but respect for a faith.

My interest in and inquiry of the matter is therefore confined to two propositions: (1) Does the literature come within the condemnation of the statute, and (2) if so,

is the appellant, the sincerity of whose advocacy thereof is conceded, protected against its compulsions by United States Constitution, amendment Articles 1 and 14, and by Mississippi Constitution, Section 13.

The first utterance in the Federal Bill of Rights forbids the prohibiting of the free exercise of religion. Such prohibition is made effective against state action by the 14th Amendment. In the Bill of Rights of our own State Constitution, the right of freedom of speech and of the press is declared "sacred." Mississippi Constitution, Sections 13 and 18.

In this connection, it is sufficient that certain primal verities of personal liberty be recognized by their mere mention. Freedom of conscience and of the press, purchased in the cruel coinage of persecution survived oppression and suppression, and after breaking down the last barriers of an exercise conceded only under license, they emerged triumphant in the purpose of the founders of our republic who had sought shores where the pursuit of happiness would be unhindered by ecclesiastical or political restraints. Religious views are not vouchsafed by the leniency of the state but upon natural indefeasible rights of conscience. Bloom v. Richards, 2 Ohio St. 387, 390; Lovell v. City of Griffin, 303 U. S. 444, 58 S. Ct. 666, 82 L. Ed. 949; Schneider v. State of New Jersey, 308 U. S. 147, 60 S. Ct. 146, 84 L. Ed. 155; State v. Greaves, 112 Vt. 222, 22 A. (2d) 497; Zimmerman v. Village of London, D. C., 38 F. Supp. 582. The founders thereupon made solemn declaration of such rights as being held not at the behest of the state but as endowments of their Creator and as such, unalienable because inherent. Such rights therefore antedated governments which in turn were instituted among men to secure them. Chance v. Mississippi Textbook, etc., Board, 190 Miss. 453, 200 So. 706; Sullens v. State, 191 Miss. 856, 4 So. (2d) 356. It was made clear that the government was held to derive its just power from the consent of the governed. Where-

upon, the people of the United States ordained their Constitution for the lofty purpose, among others, to insure domestic tranquillity, and to preserve these blessings of liberty not only to themselves but to posterity of which appellant is now a part.

Even as the several states reserved all powers not granted to the national government (U. S. Constitution, Article 10), so the citizens reserved all powers not granted to the state (Mississippi Constitution, Article 3, Secs. 5, 32). Liberty remained the sovereignty of the people. It includes all rights held to be unalienable so that in examining the issue here involved, it is as important to examine whether the state has infringed the creed of appellant as to determine whether his creed has violated the laws of the land.

A consonance between creed and conduct is one of the ends sought in the pursuit of happiness, which in the last analysis is the ultimate goal of the citizen and is a prerequisite to both individual and national tranquillity and the blessings of liberty. Whitney v. People of State of California, 274 U. S. 357, 375, 47 S. Ct. 641, 71 L. Ed. 1095; Cooley, Const. Lim. 8th Ed., p. 3. Even the safety of the republic as the supreme law must be acknowledged to rest not alone upon its power for a common defense against outside forces but upon maintaining the general welfare. In this pursuit of personal happiness, life is its condition and liberty is the avenue of its achievement. The courts must preserve it intact as a dependable causeway lest by its collapse it become a barricade. Even as liberty is guaranteed to the people, the courts must in turn guarantee life to this liberty. This happiness may not be allowed to be pursued over the crushed convictions of others whose contentment is dependent upon their right to indulge their own beliefs despite their novelty or absurdity. Happiness like disloyalty can not be judicially defined. Each must remain an abstraction subject to definition by the individual. The dilemma with which

the courts are often confronted in such cases as we now have is that they are apt to seek to define objectively things which are of necessity purely subjective. Pound, Law and Morals, p. 107. There is no prescription for either which the law can write. In the words of a familiar maxim, liberty is the power of doing what the law permits. Law is found to be a means to restrain or regulate liberty, and in this sense what the law does not forbid it sanctions. As hereafter discussed, the state can regulate conduct but not creed; it can fetter the hand but not the heart. Pound, op. cit. supra, p. 68; 4 Bl. Com. 21; Commonwealth v. Kennedy, 170 Mass. 18, 48 N. E. 770.

So that it is not only the disability of the state to control conscience but the impropriety that it should attempt to do so which has been recognized in our laws and judicial decisions. The right in the name of conscience to "affirm" instead of "swear" in all oaths, to object to active combat military service, and the disqualification for jury service in capital cases are illustrations. If it be urged that these exemptions are recognized by positive statutes, it is an answer that the initial duty, performance of which is absolved, is also decreed by positive statutes. It is as egregious a political incongruity for the state to punish apostasy as that treason should seek to justify itself by conscience. Between the two extremes where on the one hand the state is bound to protect its morals and safety despite religious disapproval, and on the other, where the citizen is free to follow his conscience despite the welfare of the state, there is an area which has ever been the embattled forum both of theorists and judges. Whether the literature disseminated and the opinions expressed by appellant, considered in the light of religious teaching, falls above or below an ascertainable line of demarcation is part of our present task.

History furnishes too many instances where atheism has preached political orthodoxy and where creedal orthodoxy has taught political heresy for us to regard

the persons of men or their affiliation with a particular sect. Since the acts of appellant are not shown to have been instigated by an illegal connivance and his opinions and teachings appear solely the compulsions of his own conscience, I do not think it is relevant to discuss nor mention the sect to which he belongs. Much of the orders of prejudice which hover about appellant seem to cling to the garments of his own peculiar cult into which a dissentient populace has breathed its disapproval. Disrobed of his identifying raiment, he is revealed as a citizen of the United States and of the State of Mississippi, and it is in his status as such that he is entitled to be judged. Meador v. Hotel Grover, 193 Miss. 392, 9 So. (2d) 782, 786; De Jonge v. State of Oregon, 299 U. S. 353, 57 S. Ct. 255, 81 L. Ed. 278. Our duty is not to approve nor condemn a ritual but to protect a freedom. We are not called upon to heed the voices of those who, smarting under what they deem a righteous resentment, would choose to display their own loyalty by casting appellant into the fiery furnace of a public's scorn. Neither should this court extend its arm to defend zealotry against the right of prejudice to speak its frenzied piece. It must direct its solicitude toward the possibility that, in striking against hands which, however justified, are grasping the torch of liberty it may thereby quench the light itself. Of all the actors in this scene, it is the court alone which is not free but must function in a field of constitutional limitations which are at once a confinement of liberty and a protecting barrier against its invasion. We may not indulge the popular privilege of obeying impulses whose sanction is solely in a love of country. We may inquire only whether the law compels that which this love demands. The one is as free to exhibit his derision as the other is to manifest his devotion. That personal liberty which the state concedes to one to vent his grievance in fervid indignation is thus made available to the other in his right to exhibit his

consecration in what he deems a righteous martyrdom. The wisdom of neither is any concern of the courts. Truth and sanity must be given both the liberty and responsibility to fend for themselves. Watson v. Jones, 80 U. S. 679, 13 Wall. 679, 20 L. Ed. 666; Sullens v. State, supra. The folly of today may be tomorrow's wisdom, and charges of heresy are apt to disclose not so much the status of the condemned as the outspoken reaction of the accuser. Free speech is not a special privilege of the critic. In a companion case this day decided (Taylor v. State, 194 Miss. 1, 11 So. (2d) 663), the controlling opinion denies to the appellant the right to invest the salute with a religious aspect. By such view, the court arrogates to itself the right to define religion for the citizen. But religion is essentially subjective. We are without right or power to say that withholding salute to the flag can not relate to religion unless we mean our own religion. If we assume authority to say that they must be put asunder, we must at the same time concede the right of others equally privileged to join them together. The dictates of conscience are dictated by and not to the conscience. In Barnette et al. v. West Virginia State Board of Education, D. C. S. D. W. Va., 47 F. Supp. 251, 255, (decided Oct. 6, 1942, by a three judge court), the court said: "The salute to the flag is an expression of the homage of the soul. To force it upon one who has conscientious scruples against giving it, is petty tyranny unworthy of the spirit of this Republic and forbidden, we think, by the fundamental law." A unity of popular approval in a ceremony of salute is eminently desirable, but it is of greater importance that the unity which the court may protect remain the only one which in a land of diverse races, creeds and philosophies can be maintained—a unity of a common possession of equal rights. The sentiment of our people's pledge to the flag—"One nation indivisible with equality and justice for all"—implies not a people

undivided in their opinions but undivided in equality and justice. "No country or no society can be conducted by partly acknowledging the securities of liberty and partly denying them, nor by recognizing some of them and denying others. That is part democracy and part tyranny." Hoover, The Challenge to Liberty, p. 198. Freedom of conscience and of religion are absolute. Cantwell v. State of Connecticut, 310 U. S. 296, 60 S. Ct. 900, 84 L. Ed. 1213, 128 A. L. R. 1352.

Homage to the flag, like disloyalty, in the absence of an established legislative ritual is what the citizen thinks it is. Even as the state may not compel an affiant to swear, and yet may punish his perjury, all that it may require, in the absence of positive law, as to loyalty, is not that it manifest itself in a regimented ceremony but that it remain loyalty. The statute here seeks to punish "disloyalty" and undertakes to define it in terms of an attitude of stubborn refusal to salute the flag. The controlling opinion in the Taylor case, supra, has defined the word "stubborn." I see no reason to assume that the legislature was unaware of its connotation nor to impute to it any purpose other than to recognize the rights of those who, not stubbornly nor arbitrarily, were "ready always to give . . . a reason of the hope that is in" them. To assume that the refusal to salute is stubborn and to argue therefrom that such course is a symptom of a deep seated disloyalty is to punish one not for the charge against him but for the evidence adduced to prove it. It is of interest to note in this connection that this "symptom" was revealed by the resourcefulness of the prosecutors who at the preliminary hearing displayed in the courtroom a large American flag and at an opportune moment requested all present to stand and salute. The convictions of appellant were thus "smoked out" when he remained seated and became at once a witness to his convictions and for the state.

I see no reason to curb the impulse to reveal a com-

plete accord with any act or ceremony which tends to invest the symbols of our freedom with homage and respectful awe. Yet in the light of that common sense which remains the back-log of all the fires of popular enthusiasm, it can clearly be seen that if one be compelled to salute our flag under coercion it would do no good, and if he refrain under conscience it would do no harm. Thomas Jefferson wrote in 1789 "I am persuaded that the good sense of our people will always be found the best army." Hart, Formation of the Union, p. 140. No one who is able to recall how betrayal can be symbolized by a salute of affection may gainsay the plain truth that loyalty is a matter not of the act but of the attitude. To withhold judicial condemnation of a conscientious refusal to salute as disloyalty is to recognize not the confounding of but the fundamental separation between the homage due the "things of God" and those "of Caesar." So that the issue in the present case becomes not one of salute vel non but loyalty vel non.

In this connection, it is appropriate to review the attitude of Gen. Washington expressed in a letter to General Lafayette in connection with the conscientious refusal of officers of a Virginia brigade to take an oath of allegiance to the Union. "As every oath should be a free act of the mind founded on the conviction of the party of its propriety, I would not wish in any instance that there should be the least degree of compulsion exercised, or to impose my opinion in order to induce any to make it of whom it is required. The gentlemen therefore who sign the paper will use their own discretion in the matter and swear or not swear as their conscience and feelings dictate." Sparks, Life of Washington, Vol. 5, p. 366.

The literature described in the indictment should not judicially be held to create an "attitude of stubborn refusal to salute the flag." Its expressed purpose is to gain adherents to their sect and the import of the

references to the flag must be construed in the light of the pledge of allegiance therein advocated. Any refusal is not therefore the fruit of a stubborn or arbitrary disdain but is the considered resultant of the forces of conscience. Gilbert v. State of Minnesota, 254 U. S. 325, 41 S. Ct. 125, 65 L. Ed. 287. It is true that the consciences of its converts as such are taught that the salute implies disobedience to divine command, but it concedes to all others the right to follow any regimen which a popular will may sanction as patriotic or proper. It is interesting to note that in this regard a tolerance is shown which their own detractors may concede to be a trait to which without hurt they might subscribe. Although I have adverted to the requirement of the statute that the refusal to salute must be stubborn before it can be defined as disloyalty, these views are based on the fundamental ground that even disloyalty, to be punished, must itself be defined in terms which will furnish a sufficiently ascertainable standard of guilt. Herndon v. Lowry, 301 U. S. 242, 57 S. Ct. 732, 81 L. Ed. 1066. Moreover, the Act of 1942 leaves disloyalty to be defined according to the wisdom or whim of the trial jurors. Chief Justice Ellsworth once charged a grand jury in regard to subversive acts that ''it was not necessary that Congress should define the offense but that the rules of a known law matured by the reason of ages and which Americans have ever been tenacious of as a birthright, you will decide what acts and misdemeanors on the ground of their opposing the existence of the national government'' you should prosecute. This novel view was, however, repudiated in United States v. Hudson, 7 Cranch 32, 34, 3 L. Ed. 259, where the court said: ''The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the Court that shall have jurisdiction of the offence.'' Patterson, Free Speech and a Free Press, p. 130. We have no statute requiring a salute to the flag.

In the dissent in the Taylor case, supra, some elaboration is made of the further requirement that the act or conduct advocated must create a clear and present danger that by force or violence the orderly processes of the government will be subverted. There is there discussed also the effect of the war emergency as requiring a readjusted standard for defining the elements of sedition.

Let it be supposed that under the stress of war psychology ninety per cent of our citizens should borrow from the vague philosophies of defendants' literature the fear that a compulsory salute to the flag smacks too much of a fascism in which the symbols and representatives of a people become deified, would the remaining ten percent be entitled to protection in their claim to a freedom thus to continue to show it homage? There can be but one answer. Constitutional rights are not subject to nullification by reference to a popularity poll. Men's consciences may not be held hostage by the state to compel conformity to a majority view.

The act under which appellant was convicted does not require that the flag be saluted in any prescribed manner. Some courts have held that it may not do so. State v. Smith, 155 Kan. 588, 127 P. (2d) 518, decided July 11, 1942; Kennedy v. City of Moscow, D. C., 39 F. Supp. 26; Reid v. Borough of Brooksville, D. C., 39 F. Supp. 30. The Gobitis case, 310 U. S. 586, 60 S. Ct. 1010, 84 L. Ed. 1375, 127 A. L. R. 1493, held that a public school had authority as such body by its regulations to compel pupils to salute the flag and to punish disobedience by expulsion. Putting aside the inapplicability of the decision to the present case (as to which, compare Clark v. State, 169 Miss. 369, 152 So. 820; 16 C. J. S., Constitutional Law, sec. 188, page 559), it is noteworthy that one of the justices in the Gobitis case dissented and that in Jones v. City of Opelika, 316 U. S. 584, 62 S. Ct. 1231, 1251, 86 L. Ed. 1691, 141 A. L. R. 514, three of those who joined in the majority opinion in the former case stated

that: "We think this is an appropriate occasion to state that we now believe that it was also wrongly decided." Our attention has been called to a recent case Barnette v. West Virginia State Bd. of Edu., 47 F. Supp. 251, decided October 6, 1942, by a three judge court for the Southern District of West Virginia. This tribunal in recognition of the present attitude of the Gobitis case as a precedent refused to follow its holding.

The statute under consideration undertakes to punish those who "either by word or deed weaken the morale or unity of our people, or adversely affect their honor and respect for the flag or government of these United States or of the state of Mississippi." It declares that such persons "are a menace to the safety of this state." The specification as to a refusal to salute the flag is thereby made a conclusive presumption of both menace and disloyalty. Whether the legislature may constitutionally go this far need not be decided since we are considering only the implied exemption in favor of religious freedom. Nor need we discuss the contention that the form of and occasion for the salute is not prescribed; nor that there is lacking even a general understanding of a public sanction thereof as a dictum of civilian etiquette. We withhold comment also upon the recent Act of Congress (Sec. 7, Act. Cong. June 22, 1942, 56 Stat. 380, Public No. 623, 36 U. S. C. A., sec. 172) which, although requiring the salute for those in military service, adds: "However, civilians will always show full respect to the flag when the pledge is given by merely standing at attention, men removing the headdress." As heretofore stated, our citizens as such are as free to construe a failure to salute as disloyalty, as are appellants to construe it as idolatry.

This court need not restrain its expression of reverence for our Nation's flag. It need not enlarge its ready witness thereto by eulogy or apostrophe, although materials for an ample encomium are not wanting and lend themselves

to fluency. Nor may the concept be denied expression that the flag is paid its sincerest homage when it is confidently left free to inspire the spontaneous respect of minds which themselves are free. The courts may control what its citizens do to our flag but not what the flag does to them.

**Anderson, J.**, and **Smith, C. J.**, concur in this opinion.

**Smith, C. J.**, delivered a dissenting opinion.

I concur in what Justice ALEXANDER has here said, but I am also of the opinion that it is not necessary to determine the constitutionality vel non of this statute for if it is valid its "respect for the flag" provision was not here violated. The language used, and that which the appellant here taught, must be such as "reasonably tends to create an attitude of stubborn refusal to salute, honor or respect the flag." The word "stubborn," which qualifies the word "refusal," must be given some effect. One of the definitions given by the lexicographers thereto, and which its context requires to be given here, is: "unreasonably unyielding." State v. Butler, 96 Or. 219, 186 P. 55. The reason given by this appellant for not himself saluting the flag and teaching others that it is wrong to do so, is based on his interpretation of the Holy Scriptures, according to which such a salute is an act of obeisance to a graven image forbidden by the First and Second Commandments and his belief that these Commandments are still in force. A most "reasonable reason" for not giving the salute. We may differ with the appellant in his interpretation of these Commandments, and I personally do, nevertheless that is a matter for his own determination and not for the determination of the judges of this or any other court.

**Alexander** and **Anderson, JJ.**, concur in this opinion.