Benoit *v.* State.

(In Banc. Jan. 25, 1943.)

[11 So. (2d) 689. No. 35163.]

Smith, C. J., and Alexander and Anderson, JJ., dissenting.

G. C. Clark, of Waynesboro, Grover C. Powell, of Atlanta, Ga., and Hayden C. Covington, of Brooklyn, N. Y., for appellant.

Greek L. Rice, Attorney-General, by Geo. H. Ethridge, Assistant Attorney-General, for appellee.

Griffith, J., delivered the opinion of the court.

In this case the proof on behalf of the state is in our opinion sufficient to sustain the verdict of conviction and

establishes that a companion of the appellant, who was jointly indicted with her, actually distributed and delivered to one of the state witnesses and in the presence of the appellant the particular pamphlet of literature mentioned in the indictment and entitled "Consolation," as a "Journal of Fact," and that both the appellant and her companion admitted to an officer, a witness for the state, that they were distributing this literature. This so-called "Journal of Fact" contained, among other articles, an editorial from the Lewiston Daily Sun which charged, among other things, that "what that flag salute rule amounts to is a contemptible, primitive worship," and also that saluting the flag is a "pitiful mockery of education." The pamphlet also contains other language undertaking to create prejudice against, and disloyalty to, the American flag among Protestant people by charging that the salute to the flag "originated in the Catholic schools of France," and that flag saluting in the United States "has covertly been pushed by the Catholic Hierarchy here."

We are of the opinion that what the appellant was found guilty by the jury of doing was in violation of Chapter 178, General Laws of Mississippi 1942, and that this case is governed by the controlling opinion in R. E. Taylor v. State, 194 Miss. 1, 11 So. (2d) 663, and by both the main and concurring opinions in the case of Clem Cummings v. State, 194 Miss. 59, 11 So. (2d) 683, this day decided.

Affirmed.

**Alexander, J.**, delivered a dissenting opinion.

It seems to me that the momentum engendered by the views expressed in the controlling opinions in the companion cases (Taylor v. State, 194 Miss. 1, 11 So. (2d) 663, and Cummings v. State, 194 Miss. 59, 11 So. (2d) 683,

decided this day) should have been checked before encompassing the appellant here.

From the pamphlet ''Consolation,'' made the basis of a fear of revolution or sedition, it may be safely assumed that the state has culled its most potent paragraphs. These selections are set forth in the indictment and quoted in other opinions herein. In comparing these vaporings with the daily utterances of our metropolitan press and of men in high places, it becomes difficult to reconcile the internment of the one and applause of the other with an equal protection of the law.

In this connection, attention is called to the fact that part of the language charged to be subversive is quoted from the press, the Lewiston Daily Sun. No pains have been taken to disclose whether this widely distributed publication has felt the heavy hand of judicial restraint. It serves to emphasize that to invest oneself with an aura of sophistication is a guaranty of immunity. The ill-advised designation of this prohibition of the compulsory salute by pupils in schools as a ''pitiful mockery of education'' is hardly less positive and much less authoritative than the expression of the court in Barnette v. Board of Education, D. C., 47 F. Supp. 251, 255, (decided Oct. 6, 1942 by a three-judge federal court) that its compulsion against conscience ''as a petty tyranny unworthy of the spirit of this Republic.''

In addition to comments in the dissenting opinion in Cummings v. State, 914 Miss. 59, 11 So. (2d) 683 (decided this day) as to the effect of the war emergency, I take occasion to quote the following pertinent and persuasive paragraphs:

''In a time of crisis, particularly, when the things we hold most dear are threatened, we shall find the desire to throw overboard the habits of tolerance, almost irresistible.'' ''I can think of no revolutionary period in history when a government has gained by stifling the opinion of men who did not see eye to eye with it; and

I suggest that the revolutionary insistence that persuasion is futile finds little creative evidence in its support." "It is evident from our experience that to limit the expression of opinion in wartime to opinion which does not hinder its prosecution is, in fact, to give the executive an entirely free hand, whatever its policy, and to assume that, while the armies are in the field, an absolute moral moratorium is imperative. That is, surely, a quite impossible position. No one who has watched at all carefully the process of governance in time of war can doubt that criticism was never more necessary. Its limitation is, in fact, an assurance that the unity of outlook is a guarantee that mistakes will be made and wrong done. For once the right to criticize is withdrawn, the executive commits all the natural follies of dictatorship." "Freedom of speech, therefore, in war-time seems to me broadly to involve the same rights as freedom of speech in peace. It involves them, indeed, more fully because a period of national trial is one when, above all, it is the duty of citizens to hear their witness." Laski, Liberty in the Modern State, pp. 56-57, 115, 123, 124-125.

Our solicitude should include the danger that in repressing fundamental rights we may lose the war upon our own home front. The conduct of the war is, of course, directed toward its success; but success means not only winning the fight but not losing our freedoms.

I realize the difficulty of restricting the bases for decision to the particular case disclosed by the record before us, as well as the self-control necessary to exclude personal predilections from judgments which should be justified solely by the applicable law. To do otherwise is to destroy the defendant with the very sword with which she had sought to protect her rights. "A judge would err if he were to impose upon the community as a rule of life his own idiosyncrasies of conduct or belief." Cardozo, The Nature of the Judicial Process, p. 108.

The absence of a definite legal yardstick by which to measure appellant's "disloyalty" is as important here as in the other cases mentioned. At the expense of repetition, the opinions voiced must bear fruitage in conduct, and such conduct must threaten a clear and present danger, and such danger must be that the functions of the government will be overthrown by force or violence or that mutiny or insubordination be engendered in our armed forces. "A man may have as bad a heart as he chooses, if his conduct is within the rules. In other words, the standards of the law are external standards, and, however much it may take moral considerations into account, it does so only for the purpose of drawing a line between such bodily motions and rests as it permits, and such as it does not. What the law really forbids, and the only thing it forbids, is the act on the wrong side of the line, be that act blameworthy or otherwise. Again, any legal standard must, in theory, be one which would apply to all men, not specially excepted, under the same circumstances. It is not intended that the public force should fall upon an individual accidentally, or at the whim of any body of men. The standard, that is, must be fixed. . . . Finally, any legal standard must, in theory, be capable of being known. When a man has to pay damages, he is supposed to have broken the law, and he is further supposed to have known what the law was." Holmes' Common Law, at pp. 110-111.

The **Chief Justice** and **Justice Anderson** concur in this opinion.

**Smith, C. J.**, delivered a dissenting opinion.

It will be necessary for me to state this case in order that one not familiar with the record may know to what questions this opinion is addressed. This indictment charged the appellant with violating that provision of Chapter 178, Laws of 1942, which prohibits oral, written,

printed or phonographic preaching or teaching "which reasonably tends to create an attitude of stubborn refusal to salute, honor or respect the flag or government of the United States, or of the state of Mississippi." The overt act charged in the indictment and to which the state directed its evidence is the distribution by the appellant of a certain publication or journal entitled "Consolation, a Journal of Fact, Hope and Courage," which contained an article under the caption "Public Opinion in Maine," which will be set forth in a footnote hereto.*

*"The Supreme Court decision supporting the legality of a Pennsylvania school board rule requiring children to salute the American flag would have been nearer right, nearer sound, if the Court had simply said that that is a matter of State jurisdiction.

"But see what a pitiful mockery of education that salute to the flag is!

"There is probably not one teacher in twenty,—not one teacher in twenty who can give you a comprehensive, adequate definition of what the flag stands for. What that flag salute rule amounts to is a contemptible, primitive worship. Those people who put such rules into the State law don't know what they are at work on.

"It is probable that not half a dozen members of any State Legislature can give an adequate definition of what the flag stands for.

"Can any legislator or any teacher give you a better definition of the flag than the emblem of American rights at sea and in foreign lands? That is, that the flag stands for what is precious to Americans outside of America.

"Try another definition. Perhaps this definition is not so good now as it was ten years ago, but say down to ten years ago, the stars and stripes stood for the Supreme Court of the United States.

"As a matter of history it is not too far to say that the Supreme Court of the United States has been the great defender of the American citizen's individual liberty and initiative, of his rights of property, of his right to protection of the laws.

"But the fundamental of that saluting the flag religion is its utter contradiction of good education. What it amounts to is a required worship, worship by the children that don't know what they are worshipping. They never will learn by that kind of tyranny.

The appellant is a member of an organization known as Jehovah's Witnesses, the members of which are spreading their conception of the Gospel from person to person and house to house. The journal referred to in the indictment is published monthly by the Watchtower Bible and Tract Society, Inc., of New York City, a Jehovah's Witness institution, and is distributed by the appellant in the course of the work in which she is engaged. The state's evidence discloses, or rather the jury was warranted in finding therefrom, that the appellant went to the residence of Annie Felix and gave her a copy of the issue of this Journal containing the article set forth in the indictment. The record does not disclose that the appellant believes that to salute the flag violates

"See how much more patriotic it would be if our teachers were given the proper opportunity to help their children to understand the government under which they live. Help them to understand the great principles of the law of the land, the great principles of the common law that the fathers brought over with them when they came from England.

"To help the children to understand what is the law of the land, what are the rights of an American citizen, to understand what police protection they are entitled to, to understand how their rights can be vindicated in the courts. And especially to understand the function of the court, what the court does for the citizen.

"To help the children to understand the duties of government; and how those duties are divided to the city, the State Government, the Federal Government.

"It is good that the Supreme Court of the United States is not going over the country to tell the States what they can do about the flag. Lewiston Daily Sun." Which said publication or journal also contained an article under the caption "French Catholics Start Flag Salute," in the following words, to wit:

"A dispatch from Monte Carlo says, 'The salute to the flag ceremony, now a daily event in all French schools, originated in the Catholic schools of France.' The type of mind that finds satisfaction in worshipping images would also be most inclined toward emblem worship of various kinds. The item confirms the claim that flag saluting in the United States has covertly been pushed by the Catholic Hierarchy here."

God's Word, or that she so taught, consequently no question of religious liberty is here presented. The salute the flag provision of this statute may not violate, on its face, the constitutional guaranties of freedom of speech and of the press, but it is subject to the criticism that a sufficiently ascertainable standard of guilt can not be found in the words "honor or respect the flag or government of the United States, or of the state of Mississippi," Herndon v. Lowry, 301 U. S. 242, 57 S. Ct. 732, 81 L. Ed. 1066, and for that reason should be held to be invalid.

The question presented on the merits of the case is: Is the article, set forth in the indictment and appearing in the issue of the Journal, entitled "Consolation," etc., given by the appellant to Annie Felix within the condemnation of the statute? This article is not addressed to voluntary saluting of the flag, but is simply a vigorous protest, giving reasons therefor, against statutes and school by-laws requiring public school children to salute the flag, and against a decision of the Supreme Court of the United States upholding such a requirement. This the statute does not and could not constitutionally forbid, for full and free public discussion of such matters is well within the constitutional guaranty of freedom of speech and of the press. Sullens v. State, 191 Miss. 856, 4 So. (2d) 356. These guaranties are not only for the protection of the individual but are also for the protection of the public in its right, fundamental in a democracy, to have the benefit of full and free discussion of governmental policies and of the conduct of government officials, to cite authority for which would be supererogatory. The appellant's request for a directed verdict of not guilty should have been granted.

**Alexander** and **Anderson, JJ.**, concur in this opinion.