Elmer L. JACOBSEN,
Defendant-Appellant,

v.

STATE of Indiana, Plaintiff-Appellee.

No. 3–1175A247.

Court of Appeals of Indiana,
Third District.

Jan. 15, 1979.

Rehearing Denied March 1, 1979.

Owen W. Crumpacker, Hammond, for defendant-appellant.

Theo. L. Sendak, Atty. Gen., Walter F. Lockhart, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

Saul I. Ruman, Hammond, for amicus curiae.

HOFFMAN, Judge.

Defendant-appellant Elmer L. Jacobsen was found in contempt of court for making false statements in an affidavit filed with the court, refusal to answer a question after being ordered to do so by the court, and the making of scurrilous charges in papers filed with the court.

On appeal appellant raises the following issues for our consideration:

1. Whether there was sufficient evidence to support the findings;

2. Whether the trial court lost jurisdiction of the case after it granted a change of venue in the underlying case of *Portage National Bank v. Robert Skaggs et al.;* [1]

3. Whether the trial court erred in not appointing another judge to hear the case;

4. Whether appellant was afforded notice and an opportunity to be heard;

5. Whether appellant was entitled to discharge on the basis of his sworn answers;

6. Whether the court failed to observe the provisions of the Criminal Contempt Act;

7. Whether the court erred in permitting intervention;

8. Whether the court erred in denying bail pending appeal; and

9. Whether the court erred in "forcing" appellant to testify.

Appellant first challenges the sufficiency of the evidence to support the findings of contempt made by the trial court. The record discloses that during the course of proceedings in *Portage National Bank v. Robert Skaggs, et al.,* a witness Sherman Skolnick was found to be in direct contempt of court. On July 21, 1975, the trial court heard and denied Skolnick's motion for reconsideration. On July 25, 1975, Skolnick filed with the court his "Third and Additional Motion . . . By Way of Exception to the Opinion and Judgment of the Court and for a Reconsideration of its Opinion and Judgment of the Case." Contained within that motion was the allegation that attorney Saul Ruman undertook to connive and confederate with Judge Pivarnik during the noon hour for the purpose of devising a plan or scheme to abort any investigation into charges of corruption and judicial impropriety alleged by Skolnick. The affidavit of appellant Jacobsen was attached to such motion in support thereof. The affi-

---

1. This action was filed in the Porter Superior Court under Cause No. 75–PSC–1233.

davit states that during the noon hour of July 21, 1975, he observed the trial judge and an attorney depart for the Old Style Restaurant area, that he later observed them return from the restaurant area at 1:00 P.M. and enter the courthouse, and that approximately 40 minutes later that attorney was addressing the trial judge in open court in the Skolnick matter. The affidavit further stated that after the attorney addressed the court, Skolnick addressed the court with interruptions until he was found guilty of direct contempt of court.

On July 29, 1975, the date set for hearing on certain of Skolnick's motions, Skolnick filed a motion to submit his previous motions without oral argument. After unsuccessfully attempting to call appellant as a witness, the trial court ordered the clerk to issue a citation to appellant ordering him to appear to show cause why he should not be held in direct contempt of court for the statements made in his affidavit.

Jacobsen admitted at the August 6, 1975 hearing that he did not know what had occurred in the Old Style Restaurant nor with whom the trial judge had lunch. Moreover, Jacobsen admitted that he did not see the trial judge and the attorney return from the restaurant area together nor enter the courthouse building, but that the first time he saw the trial judge and the attorney together after the noon hour was approximately six feet west of the elevator portion of the courthouse lobby. Other affidavits filed in the matter disclose that the trial judge and the attorney did not have lunch together.

■ Appellant contends that such actions do not constitute direct contempt of court. In *Kerr v. State* (1923), 194 Ind. 147, 141 N.E. 308, our Supreme Court held that the making of scurrilous charges against a judge in a pleading filed with the court constituted direct contempt. The court reasoned that since the making of false statements in the courtroom where the judge was holding court would have constituted a direct contempt of court, the making of such charges in a pleading filed with the

court would likewise constitute a direct contempt. *See: Coons v. State* (1922), 191 Ind. 580, at 593, 134 N.E. 194, at 198. This reasoning applies with equal force to one who, disregarding the oath he took as an affiant, gives testimony he knew to be false. IC 1971, 34-4-7-2 (Burns Code Ed.), provides that anyone who purposely demeans himself as to retard or disturb the proceedings of the court is guilty of direct contempt. This has been interpreted to apply to a witness who testifies falsely. *Young v. State* (1926), 198 Ind. 629, 154 N.E. 478. Thus, the making of a false affidavit appended to papers filed with the court constitutes a direct contempt.

Appellant contends however that he did not know the affidavit would in fact be filed. Jacobsen stated that the affidavit did not have any blanks on it at the time it was executed. Both the caption and title of the affidavit refer to the Skolnick matter. Moreover, Jacobsen had graduated from law school and admits the affidavit was for Skolnick's information, knew it had the potential of being filed and contemplated that it could be used in the Skolnick proceeding. Thus, the trial court did not err in finding appellant in contempt for making false statements in the affidavit.

■ The second finding of contempt occurred during the August 6, 1975 hearing. After stating that an attorney had telephoned him asking what his observations were on July 21, 1975, Jacobsen refused to divulge the name of that attorney. After advising Jacobsen there was no attorney-client privilege and upon Jacobsen's further refusal to answer the question, the court found Jacobsen in direct contempt of court. Assuming arguendo that the relationship between Jacobsen and the undisclosed attorney was sufficient to invoke the attorney-client privilege and further assuming the publication of the affidavit did not constitute a waiver of the privilege, the weight of authority nevertheless refuses to extend the attorney-client privilege to the fact of consultation or employment including the component facts of the identity of the client and the attorney, McCormick et al., *Evi-*

dence, § 90, at 185–86 (2d Ed.1972); *Colman v. Heidenreich* (1977), Ind.App., 366 N.E.2d 686. Thus, the trial court did not err in finding appellant in contempt for refusal to answer a proper question.

The third finding of contempt arose from statements made in appellant's "Verified Return to Contempt Citation Paragraph II" which was filed in open court at the commencement of the August 6, 1975 hearing. Such paper charged the trial judge with certain improprieties in another wholly unrelated case. However, the making of scurrilous charges against a judge in papers filed with the court constitutes direct contempt. *Kerr v. State, supra.* Moreover, appellant's argument merely asserts that he had a privilege as a defendant to make such statements and that he was entitled to discharge on the basis of his verified return.

Appellant next contends that the trial court did not have jurisdiction over the contempt proceedings after it had granted a change of venue in the underlying case of *Portage National Bank v. Robert Skaggs et al.* Although a direct contempt is a separate and distinct action, it must be decided who the court is when pleadings are filed. The jurisdiction of the cause in which the pleadings are filed should govern. Thus, the question of jurisdiction of the cause must be decided. The record discloses that on July 16, 1975, the parties in the *Skaggs* case were in court on Portage National Bank's petition to fix bond on immediate possession of certain secured property. On that date, Skaggs filed their motion for change of venue from the judge which was denied until resolution of the preliminary matter concerning immediate possession. It was during the hearing of this matter that Skolnick was found in contempt. In Skolnick's motion for reconsideration, the affidavit of Jacobsen was attached.

Skaggs' motion for change of venue from the judge did not deprive the trial judge of jurisdiction for certain emergency matters. *State ex rel. Keesling v. Grant Cir. Ct. et al.* (1958), 238 Ind. 577, 153 N.E.2d 912; *Smith et al. v. St. Bd. of Health* (1973), 158 Ind.

App. 445, 303 N.E.2d 50 (transfer denied), *cert. den.* 419 U.S. 836, 95 S.Ct. 63, 42 L.Ed.2d 62. The petition for immediate possession of property was such an emergency matter. Thus, the trial court had jurisdiction over the contemptuous conduct of Skolnick occurring during the hearing on the petition. The trial court likewise retained jurisdiction for Skolnick's rehearing. *See,* IC 1971, 34–4–7–7 (Burns Code Ed.); Indiana Rules of Procedure, Criminal Rule 9. *See also,* Indiana Rules of Procedure, Trial Rule 63(A).

Thus, any contemptuous acts occurring during the proceeding for rehearing would likewise be within the jurisdiction of the court.

Appellant's reliance on *State ex rel. Ballard v. Jefferson Cir. Ct.* (1947), 225 Ind. 174, 73 N.E.2d 489, is misplaced. There the judge, on his own motion and subsequent to the motion for change of venue, attempted to cite defendant for indirect contempt for failure to comply with an order made prior to the request for change of venue. In the case at bar, however, the direct contempt of Skolnick occurred at a time in which the court retained emergency jurisdiction. And, since the court had jurisdiction over Skolnick's rehearing, it had jurisdiction of any contemptuous conduct occurring therein.

For the reasons stated in their separate opinions, Presiding Judge Garrard and Judge Staton vote to reverse the conviction arising from the false statement in the Skolnick pleading. I would, however, affirm that conviction for the reasons that follow.

Appellant would rely on IC 1971, 34–4–8–1 (Burns Code Ed.) for the proposition that a special judge should have been selected to hear the original charge of contempt. But that statute applies only in cases of indirect contempt. In a direct contempt proceeding a party is not entitled to a change of venue from the judge or county. *Dale v. State* (1926), 198 Ind. 110, 150 N.E. 781; *Coons v. State, supra.* Thus, Indiana law does not require a judge to

disqualify himself in a direct contempt proceeding. Moreover, personal attacks cannot be leveled at the judge in an attempt to drive him from the case. *Cooke v. United States* (1925), 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767. *Finally, it should be noted that appellant did not object to the judge presiding over the contempt proceedings and he should therefore be precluded from raising that issue on appeal.*

Appellant next contends that the trial court erred in ordering a contempt citation on July 29, 1975, without affording appellant notice and an opportunity to be heard. The trial court attempted to call Jacobsen on July 29 and inquire as to his conduct. However, Jacobsen was not present. Accordingly, the trial judge set forth the specific conduct which would constitute contempt and ordered the clerk "to issue a citation to the affiant Elmer L. Jacobsen ordering him to appear at a hearing to be had on the 1st day of August, 1975, at 2 o'clock p. m.; and show cause why he should *not* be held in direct contempt of this Court." Thus, the order of July 29, 1975, was itself the vehicle by which appellant was afforded notice of the charges made against him and of his opportunity to be heard on such charges at the hearing.

Appellant next contends that the trial court failed to observe the provisions of the Criminal Contempt Act. Insofar as such an argument presupposes that the nature of the action was indirect contempt rather than direct contempt, it is without merit. However, the argument is also addressed to the proceedings for direct contempt outlined in IC 1971, 34–4–7–7, *supra,* which provides, in part, as follows:

"Trial for direct—Appeal.—When any person shall be arraigned for a direct contempt, in any court of record of this state, no affidavit, charge in writing, or complaint shall be required to be filed against him; but the court shall distinctly state the act, words, signs or gestures, or other conduct of the defendant which is alleged to constitute such contempt; and such statement shall be reduced to writing either by the judge making it, or by some reporter authorized by him to take it down when made; and the same shall be substantially set forth in the order of the court on the same, together with any statement made in explanation, extenuation, or denial thereof, which the defendant may make in response thereto; and the court shall thereupon pronounce judgment, either acquitting and discharging the defendant, or inflicting such punishment upon him as may be consistent with the provisions of this act [34–4–7–1—34–4–7–10]; * * *."

Appellant asserts that such statute entitled him to be distinctly informed of the charges before the hearing began. However, the conduct underlying the contempt charge was set forth in writing in the July 29, 1975, order of court. And, at the commencement of the hearing on August 6, 1975, appellant, in response to inquiries made by the court, admitted he was personally served with notice of the hearing, that he had read the pleading, and that he understood the nature and purpose of the hearing. Moreover, appellant filed several motions at the beginning of the hearing which acknowledge receipt of the contempt citation and the existence of, and appellant's familiarity with, the July 29, 1975, court order.

Appellant further contends that the order finding appellant in contempt did not comply with IC 1971, 34–4–7–7, *supra,* since it merely recited the court's conclusions. In the case at bar, the July 29, 1975, order set forth the specific acts of appellant which constituted the contempt. Although the statute does not require an affidavit specifying the charges against appellant and a rule to show cause, *Kerr v. State, supra,* the statute does not foreclose that avenue of procedure. One of the purposes of the statute is to keep to a minimum the dangers inherent in summary direct contempt proceedings by enabling an appellate court to determine by an inspection of the record whether a contempt has in fact been committed. In the case at bar, these goals are satisfied when the judgment made reference to the filing of the affidavit of July 24,

1975. The prior court order set out the specific acts constituting the contempt.

The second finding of contempt was the refusal to answer a question after having been ordered to do so. And the third finding of contempt set forth the pleading which the court found to be contemptuous. The court order was more specific than the broad order found in *State ex rel. Stanton v. Murray; Stanton v. State* (1952), 231 Ind. 223, 108 N.E.2d 251. Accordingly, the record discloses the specific acts of appellant which would support a judgment against appellant for contempt.

Appellant next contends that the trial court erred in permitting attorney Saul Ruman to intervene in the case to assist the court. Ruman petitioned the court to intervene as either an interested party or as amicus curiae to protect himself and his client and to assist the court in the lawful and orderly disposition of the case. Such petition was granted by the court. Permissive intervention is a matter within the trial court's discretion. Indiana Rules of Procedure, Trial Rule 24(B). Appellant has not argued that the trial court abused its discretion nor has appellant demonstrated in what manner he was harmed.

Appellant was also permitted to intervene as amicus curiae. Since no action by the amicus curiae can affect the legal rights of a party to an action, it is not reversible error to permit the appearance of an amicus curiae. *In re Perry* (1925), 83 Ind.App. 456, 148 N.E. 163.

Appellant next contends that he was entitled to discharge based upon his denial of misconduct in his sworn answers. However, the rule of "purgation by oath" does not apply in direct contempt proceedings.

Appellant next contends that the trial court erred in denying bail pending appeal pursuant to IC 1971, 35-4-6-1 and 35-4-6-2 (Burns Code Ed.). However, due to our resolution of the appeal this issue must be considered moot. It should be noted, however, that the trial court did set bail on August 20, 1975, after appellant gave notice in open court of his intention to file an appeal and agreed to file an amended praecipe by August 5, 1975.

Appellant next contends that the trial court erred in forcing the appellant "to give incriminating testimony against himself in violation of his constitutional rights, including his right to be represented by counsel." Appellant had graduated from law school and had worked for ten years as a "court-watcher" for the Northwest Indiana Crime Commission. During the course of the proceedings, appellant stated that he was acting as his own attorney. He filed several papers with the court both at the time of the hearing and subsequent thereto. At the hearing appellant did not object in any manner to being sworn to testify. Thus, when appellant voluntarily testified, he waived his Fifth Amendment privilege. *Sears v. State* (1972), 258 Ind. 561, 282 N.E.2d 807; McCormick et al., *Evidence*, § 132, at 278 (2d Ed.1972). Thus, appellant was not forced to testify against himself.

For the reasons stated in the separate opinions of Presiding Judge Garrard and Judge Staton, the conviction arising from the false statement in the Skolnick pleading is reversed and remanded for a new trial. The remaining convictions (those arising out of the contempt proceeding itself) are affirmed.

Affirmed in part, reversed in part and remanded.

GARRARD, P. J., concurs in part and dissents in part with opinion.

STATON, J., concurs in part and dissents in part with opinion.

GARRARD, Presiding Judge, concurring in part and dissenting in part.

■ The appellant was convicted of three contempts of court. The first arose from his affidavit filed in open court as part of a pleading concerning the contempt of one Skolnick. The second was his refusal to answer a question while on the witness stand. The third arose from the contents of a pleading he filed in response to his own contempt charges. Under Indiana law these offenses, if established, are all direct

contempts. *Kerr v. State* (1923), 194 Ind. 147, 141 N.E. 308; *Coons v. State* (1922), 191 Ind. 580, 134 N.E. 194; *Matter of May* (1976), Ind.App., 358 N.E.2d 138 (pleadings); IC 34–4–7–2 (refusal to testify). Thus, appellant's arguments premised upon the failure of the court to follow the statutory requirements applicable to indirect contempts avail him nothing. For the same reason his jurisdictional argument which attempts to urge that jurisdiction to punish indirect contempt follows the case in which it occurs is without merit. *See Matter of May, supra.*

█ Secondly, while I agree with Judge Staton that there was no basis for *intervention* by attorney Ruman, I believe it was proper to treat him as amicus curiae. Certainly the most familiar example of service as friend of the court is that of advising the court through presentation of some pertinent legal analysis. However, the term is not restricted to that usage. As stated in 4 Am.Jur.2d, *Amicus Curiae* § 1, p. 109,

"... [T]he term includes persons, whether attorneys or laymen, who interpose in a judicial proceeding to assist the court by giving information, or otherwise, *or who conduct* an investigation or other proceeding *on request* or appointment therefor *by the court.*" (Emphasis added)

*See also State ex rel. Reichert v. Youngblood* (1947), 225 Ind. 129, 73 N.E.2d 174.

█ It appears to me that only one issue of substance appears in this case. Even though the acts involved constituted direct criminal contempt of court, were they properly punished through a summary proceeding conducted by the judge before whom they were committed?

Our ordinary notions of due process dictate that before someone is punished through the operation of our legal system he is entitled to a trial, and a trial conducted by someone other than his accuser. Yet an exception has always been recognized concerning the commission of direct criminal contempts. As the Supreme Court stated in 1821 in *Anderson v. Dunn,* 6 Wheat. 204, 226, 19 U.S. 204, 5 L.Ed. 242:

"But if there is one maxim which necessarily rides over all others, in the practical application of government, it is, that the public functionaries must be left at liberty to exercise the powers which the people have intrusted to them . . . . The unreasonable murmurs of *individuals against the restraints of society, have a direct tendency* to produce that worst of all despotisms, which makes every individual the tyrant over his neighbor's rights. That '*the safety of the people is the supreme law*'not only comports with, but is indispensable to, *the exercise of those powers* in their public functionaries *without which that safety cannot be guarded.*" (Emphasis added)

The balance for this principle arises from our recognition that in exercising the power of self preservation the extent of the power assumed must be "the least possible power adequate to the end proposed." 6 Wheat. at 230.

Within this context two principal themes have emerged concerning direct contempt of court.

In order to justify summary disposition the contemptuous conduct must have occurred within the presence *and* knowledge of the court. The reason is obvious. Only then can we be assured that no factual issue exists as to what occurred. Admittedly, indistinct or troublesome aspects of this requirement may occasionally arise. They are to be met, however, through our recognition that despite the personal knowledge held by the court, the contemner will be afforded notice necessary to due process, the opportunity to be heard in explanation or mitigation and the right to appellate review. *See, e. g., Taylor v. Hayes* (1974), 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897. (Although some decisions, notably *Sacher v. United States* (1952), 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717, indicate this requirement alone may justify summary treatment, the more recent decisions clearly demonstrate this is not so. *Taylor, supra; Mayberry v. Pennsylvania* (1971), 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532.

The other justification necessary to summary punishment imposed by the judge before whom the conduct occurred is generally referred to as the self preservation function. That is to say, in order to justify summary treatment there must be ,a rational basis for a reviewing court to conclude that there is a legitimate nexus between the court's action and the preservation of the respect and orderly administration which the judicial system must maintain to fulfill its role in government. *See Mayberry, supra; Cooke v. United States* (1925), 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767.

While Mr. Chief Justice Taft, writing for the majority in *Cooke,* spoke of the delicate balance necessary to insure that the court's actions were indeed preserving rather than destructive,[1] until the last quarter century little scrutiny was given to reviewing the particular circumstances of the case against the need for preservation. In my view *Cooke* spoke to the propriety of a judge *permitting* another to hear the charge when he could do so without impairing the proceedings or the respect necessary to sustain the judicial branch of government. The more recent cases have considered when he *must* do so.

Several considerations have emerged, and it should be borne in mind that the essence of the scrutiny is not whether contumacious conduct must go unpunished or that all deterrent effect of the punishment must be foregone. It must be equally recalled that the boundaries of due process are designed-

ly vague and that flexibility exists as to means and procedures to affect its substance. *See, e. g., Bute v. Illinois* (1948), 333 U.S. 640, 68 S.Ct. 763, 92 L.Ed. 986.

Following Mr. Chief Justice Taft's comment some distinction has been drawn as to whether the conduct is of a type calculated to personally affront the judge, *Ungar v. Sarafite* (1964), 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921, or whether the judge had actively engaged in combat with the contemner so that his own misconduct was a necessary consideration.[2] *Offutt v. United States* (1954) 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11.

The determination that Sixth Amendment rights to trial by jury exist in some criminal contempts has a necessary impact, but it is one we need not consider herein since it is fixed upon the basis of the severity of punishment. *See Bloom v. Illinois* (1968), 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522.

Of great significance, however, are the cases which attempt to resolve the question of why the court may act summarily upon the basis of when it acts. *Mayberry, supra; Taylor, supra.* Their basic thrust appears to be that when the court waits until the conclusion of several days or weeks of trial to adjudicate the contempt, the need for preservation is so diminished that it is outweighed by the need that "justice must satisfy the appearance of justice." 91 S.Ct. at 505.

---

1. The often-cited passage states:

   "The power of contempt which a judge must have and exercise in protecting the due and orderly administration of justice, and in maintaining the authority and dignity of the court, is most important and indispensable. But its exercise is a delicate one, and care is needed to avoid arbitrary or oppressive conclusions. This rule of caution is more mandatory where the contempt charged has in it the element of personal criticism or attack upon the judge. The judge must banish the slightest personal impulse to reprisal, but he should not bend backward, and injure the authority of the court by too great leniency. The substitution of another judge would avoid either tendency but it is not always possible. Of course where acts of contempt are palpably aggravated by a personal attack upon the judge in order to drive the judge out of the case for ulterior reasons, the scheme should not be permitted to succeed. But attempts of this kind are rare. All of such cases, however, present difficult questions for the judge. All we can say upon the whole matter is that, where conditions do not make it impracticable, or where the delay may not injure public or "private right, a judge called upon to act in a case of contempt by personal attack upon him, may, without flinching from his duty, properly ask that one of his fellow judges take his place." 267 U.S. 517, 539, 45 S.Ct. 390, 395, 69 L.Ed. 767.

2. Rule 42(b), Federal Rules of Criminal Procedure expressly provides for disqualification if the contempt "involves disrespect to or criticism of a judge."

In this context it is relatively easy to transpose from other cases language employed to scrutinize whether the allegedly contemptuous conduct was of a variety that might not demonstrate the necessary nexus between preservation and summary treatment. *See, e. g., In re Michael* (1945), 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30 (perjury); *In re McConnell* (1962), 370 U.S. 230, 82 S.Ct. 1288, 8 L.Ed.2d 434 (attorney's argument) and the discussion in *United States v. Seale* (7th Cir. 1972), 461 F.2d 345, 369.

The logical extension of these concerns is to conclude, as Judge Staton's opinion herein appears to me to do, that summary punishment adjudicated by the judge before whom the conduct occurred can no longer be permitted except where it is employed at the moment the conduct occurs. This follows from the notion that such punishment is permissible *only* to prevent immediate interruption and obstruction of the proceeding at hand. That only then can it be said that the nexus to preservation appears. *Seale, supra.*

The basic problems with such reasoning were carefully examined by Judge Frank in his concurring opinion to the Court of Appeals' decision in *United States v. Sacher* (2nd Cir. 1950), 182 F.2d 416.

Because it addresses conduct which has already occurred, the preservation function served by summary punishment is wholly prospective and "must be justified solely by the fact that it will tend to prevent future misconduct—either (1) in the future course of the same case or (2) in other future cases." 182 F.2d 456. In other words, even for the sole purpose of maintaining the continuity of a proceeding, summary punishment can have no more than a future effect; it acts to maintain control only to the extent it serves as a *deterrent.*[3]

It is urged that in any event summary punishment cannot be justified simply to deter interruptions of *future* cases.[4] Yet demoralization of the court's authority before the public clearly appears to have previously been recognized as a proper justification in prior decisions. *See In re Oliver* (1948), 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682.

While criminologists still disagree as to the extent punishing one deters others, I agree with Judge Frank that, at least in some cases, punishment of an offender may be both a direct and an indirect deterrent to others. It may directly deter others from engaging in similar conduct. Its indirect effect occurs through creating or strengthening broad social habit and perception as to how justice should be administered. It fosters a public attitude of respect. 182 F.2d at 458.

In this latter regard another point bears mention. In *Mayberry* the Court stressed the need vis-a-vis the defendant that we must be concerned not only with justice, but with the *appearance* of justice. *See also Faretta v. California* (1975), 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (*pro se* representation). I agree with this concern. However, its root must lie not with the individual accused (who is rarely likely to thank his prosecutor) but with a broader base of which he is merely a part. How does society in general perceive the appearance of justice? I suggest that on this basis there is a counter-balancing consideration. On the one hand society will not perceive the appearance of justice in the image of a vindictive heavy-handed judge meting out punishments for minor breaches of decorum or merely "spirited advocacy."

3. Thus, while *Illinois v. Allen* (1970), 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353, *reh. den.* 398 U.S. 915, 90 S.Ct. 1684, 26 L.Ed.2d 80, recognizes that more direct methods may be required to maintain continuity, it also accepts as viable for many instances the deterrent effect of summary contempt.

4. As Judge Frank pointed out, one of the problems with this approach is that it would leave the court powerless to utilize summary punishment where the offense occurred while no trial was in progress. His example placed the judge upon the bench waiting a case to be called when someone ran into the courtroom shouting that the judge was a tyrant and threw an ink bottle at him. Presumably the same quandary would exist during recesses and before or after adjournment for the day.

On the other hand I believe society perceives justice as more than the image of an effete system of courtroom proceedings to be conducted without respect by men and women lacking in honor and unable to quell disturbance.

The power to not only punish for contempt, but to do so summarily, does enforce the perception of justice at least where the right of appeal is protected. Just as the most valuable weapon to organized labor in the collective bargaining process is most probably not the strike, but what may be accomplished under its threat, so the effect of summary punishment for contempt may have its real nexus to preservation simply in knowledge of the court's proper power to act. From this it may be deduced that in the recognized absence of such power it would indeed be difficult to maintain not merely order, but the very acceptance necessary for the success of the judicial system. Even with the ability to punish *instanter*, but not otherwise in summary fashion, the recalcitrant might elect the disruptions of that process to the trial-in-chief.

As a practical consideration, then, a party could disrupt the proceedings and undermine the role of the courts if the power to punish summarily is limited to instant adjudication. If the court passes the opportunity, the disrupter may proceed secure in the knowledge that only at some later date will he be called to answer. Yet if the court proceeds with citation at once and conducts the necessary hearing, by repetition, the citation hearings themselves become the disruption.

In addition, to the extent that either justice or its perception are marred by the chance that a judge through pique or vindictiveness will overreact to insult, that opportunity is magnified by requiring the judge, if he is to act at all, to do so without time to reflect. *See Sacher v. United States, supra.*

It appears to me that taken together these considerations disclose the value and necessity for affirming the power of a court to summarily impose punishment for direct contempt *not* limited to instant adjudications permissible solely for the purpose of insuring the continuity of the proceeding. It appears equally that due process of law is not a necessary barrier to that result.

When, then, may summary punishment be imposed by the judge before whom a contempt was committed? *Mayberry* and *Taylor* rule that where parties or counsel are involved in trial, the court may not wait several days until the trial is concluded. Furthermore, in *Taylor* the fact that the court told Taylor during the trial that he was in contempt and in most instances gave opportunity for response shortly thereafter was insufficient. While the Court seemed greatly concerned about the judge engaging in combat per *Offutt,* it did treat the contempts as not finally adjudicated until sentence was imposed.[5] 94 S.Ct. 2702.

Since *Cooke* it has been clear that it is judicially proper for a judge to defer a contempt adjudication to a different judge. It is equally clear that a member of the judiciary should weigh in the given instance the benefits to be derived from recusal, and should not hesitate to disqualify himself merely to avoid the burden of a separate hearing. However, these considerations do not rise to the level of a constitutional due process mandate.

It appears to me that an ingredient for the nexus between summary punishment and the preservation function is that the court promptly advise the person in question that the conduct is, or verges upon, contempt and that if continued with the same or other disrespectful conduct citation will occur.[6] When this is done I believe the rational basis necessary to sustain summary action exists and comports with due process at least where the opportunity to be heard is afforded and the contempt adjudicated

---

5. There would appear to be no obstacle to imposing sentence and withholding its execution until conclusion of the trial.

6. Under appropriate circumstances a person may be adequately admonished in this regard *prior* to the actual occurrence of any disruption or show of disrespect.

before the recommencement of trial upon the next day, or in the absence of a continuing trial, as an early order of business upon the next day.

Upon this basis, however, I am forced to conclude that Jacobsen was entitled to a hearing before a different judge for the first contempt, and therefore that conviction must be reversed. However, the court was not without jurisdiction, and accordingly conviction for the two contempts which occurred at the hearing was proper.

I would reverse and remand the conviction for the first contempt for further proceedings and would affirm the second and third convictions.

STATON, Judge, concurring in part and dissenting in part.

■■■ I concur in the majority's conclusion that Jacobsen's refusal to answer a question at the August 6 hearing and his filing of a pleading containing scurrilous material on August 6 amounted to direct criminal contempts of court. But I do not concur in the rationale set forth by the majority in its disposition of these issues. Furthermore, the contempt conviction based upon material in Jacobsen's affidavit, filed by Skolnick on July 25, should not have been affirmed by the majority. This contempt conviction should be reversed, and I dissent to its affirmance. The contempt hearing on the July 25 affidavit did not occur until August 6. The trial judge had a duty to disqualify himself from presiding at the August 6 contempt hearing.

### I.

### "Jurisdiction Over Contempt"

■■ Jacobsen's claim that the trial judge had no jurisdiction of his case after a change of venue was granted in the *Skaggs* action is without merit, and the majority

errs when it attempts to seek out and attach a jurisdictional basis to it. A criminal contempt action is a proceeding separate from the action out of which it arose. *Allison v. State ex rel. Allison* (1963), 243 Ind. 489, 187 N.E.2d 565. This principle applies to direct as well as indirect criminal contempt proceedings. *Matter of May* (1976), Ind.App., 358 N.E.2d 138. Since a criminal contempt proceeding is a separate action, its jurisdiction is independent of any other cause or action. *Allison, supra.* Hence, when the trial judge ordered Jacobsen on July 29, 1975 to show cause why he should not be held in direct criminal contempt, there arose a criminal contempt action separate and independent of any other proceeding. Jacobsen's contempt case was independent of the *Skaggs* action.

A discussion of whether the trial judge had jurisdiction to cite Jacobsen for contempt for his conduct on August 6 (his refusal to answer a question and his filing of a pleading containing contumacious material) is irrelevant. The authority of an Indiana court to cite and punish direct criminal contempt is not dependent upon its jurisdiction of the contemnor or of the subject matter of a case. In *McIntire v. State* (1967), 248 Ind. 142, 223 N.E.2d 347, the Indiana Supreme Court wrote: "In direct contempt proceedings the court has inherent power to take such action as is necessary to maintain the decorum and order in the court, as well as to enforce its necessary orders." 248 Ind. at 144–45, 223 N.E.2d at 348–49. *See also LaGrange v. State* (1958), 238 Ind. 689, 153 N.E.2d 593. The trial judge acted within the scope of this inherent power when the need arose on August 6 to find Jacobsen in direct criminal contempt for failure to answer a question and for filing a pleading containing contumacious material.[1]

---

1. Language in Indiana's direct contempt statutes reinforces this conclusion. IC 1971, 34–4–7–1 (Burns Code Ed.), provides:

   "Every person who shall, by the commission of any felony, misdemeanor, or other unlawful act; or who by talking, moving about, or by signs, or gestures, or in any other manner, in any court of record, while the same is open for the transaction of business, and engaged therein, create any noise or confusion therein, whereby the business and proceedings of said court shall be disturbed, shall be deemed to be guilty of a direct contempt of said court."

## II.

### Intervention

██ The trial judge abused his discretion in allowing attorney Ruman to appear as an intervenor and *amicus curiae* in Jacobsen's case. This abuse of discretion will not, however, work to reverse the direct contempt convictions.

Barring any statute conferring a conditional right to intervene, permissive intervention may be allowed when "an applicant's claim or defense and the main action have a question of law or fact in common." Ind.Rules of Procedure, Trial Rule 24(B)(2). It is inconceivable how attorney Ruman could have a claim with a question of law or fact in common with an action for direct criminal contempt.

A procedure for criminal contempt is in the nature of a criminal action against an accused person. *Ex parte Fennig* (1939), 216 Ind. 298, 23 N.E.2d 678. In *Fennig* the appellant was found in criminal contempt for filing a pleading containing contumacious statements directed at a judge and a private party. On his appeal the judge and private party designated themselves as "properly appellees herein" and sought to have the appeal dismissed. In upholding the appeal the Indiana Supreme Court asserted:

"This was a case of criminal contempt and should not have been either instituted or maintained for the benefit of these two individuals. They were not, in any sense of the word, parties to the judgment appealed from. The fact that the appellant may have made contemptuous remarks and sought to injure them as individuals is no reason for making them parties to this appeal. The offense of the appellant was against the state. If . . [they] have been injured as individuals

they have appropriate civil remedies for redress. . . ." 216 Ind. at 300, 23 N.E.2d at 680.

*See also Allison v. State ex rel. Allison* (1963), 243 Ind. 489, 187 N.E.2d 565 (party harmed in the case of criminal contempt is the State and not a private individual). As in *Fennig, supra,* attorney Ruman had appropriate civil remedies for redress if he was injured by Jacobsen's statements. He had no claim with a question of law or fact in common with the criminal contempt action.

Additionally, the trial judge committed the threshold error of allowing attorney Ruman to appear both as an intervenor and as an *amicus curiae.* An intervenor is a party to the action with an interest in the subject matter of the suit; an *amicus curiae,* on the other hand, is an adviser to the court, and he

"is not a party to the suit and has no control over it. . . . [He] has no rights in the matter. He can file no pleadings, or motions of any kind. He can reserve no exception to any ruling of the court and, of course, cannot prosecute an appeal . . . [S]ince the *amicus curiae* can do nothing other than advise the court, no party to the action has any cause to complain if the court grants a stranger the privilege of being heard, since no action of such party can affect the rights of a party to the action."

*In re Perry* (1925), 83 Ind.App. 456, 462, 148 N.E. 163, 165. Hence appearance of an individual as an intervenor-*amicus curiae* is logically inconsistent. It is also susceptible to claims of bias, as the trial court is in effect calling for assistance from one who has an interest as an intervenor in the outcome of the case.

IC 34-4-7-1 recognizes the court's authority to punish every person whose conduct disrupts court proceedings. "Every person" contemplates that a party, attorney, spectator or juror may be guilty of a direct contempt of court. Similarly, IC 1971, 34-4-7-2 (Burns Code Ed.), provides that "[e]very person" called as a witness in a proceeding may be held in direct contempt for certain proscribed conduct. Direct contempt anticipates the need of courts to act immediately and summarily to cite and punish conduct which disturbs court proceedings or manifests disrespect for the court. *Brennan v. State* (1961), 242 Ind. 79, 173 N.E.2d 312; *LaGrange v. State* (1958), 238 Ind. 689, 153 N.E.2d 593. A jurisdictional basis is therefore unnecessary.

In addition, the appearance of an intervenor-*amicus curiae* may hamper an alleged contemnor's defense. One who is ordered to show cause why he should not be held in criminal contempt could never be certain at any given time about the capacity in which the intervenor-*amicus curiae* was appearing. For example, an alleged contemnor could object to the appearance of the individual as intervenor and could take exception to the trial court's ruling on evidence presented by him; but, where the same individual appears as an *amicus curiae* the alleged contemnor would have "no cause to complain if the court grants the privilege [to him] of being heard." *Perry, supra,* 83 Ind.App. at 462, 148 N.E. at 166.

Despite the trial court's abuse of discretion, the two direct contempt citations addressed above must be affirmed. The trial judge was compelled on August 6 to take summary action to prevent disruption of the proceedings and to maintain the dignity of the court.

### III.

### Disqualification of Trial Judge

■ I would reverse that contempt conviction based on material in Jacobsen's affidavit, filed by Skolnick on July 25, 1975. The trial judge, whose conduct was attacked in the affidavit and who ordered Jacobsen on July 29 to show cause why he should not be held in direct criminal contempt, should have disqualified himself from presiding at the August 6 contempt hearing.

A direct criminal contempt concerns a disturbance or show of disrespect in open court. IC 1971, 34-4-7-1 (Burns Code Ed.); *In re Perrello* (1973), 260 Ind. 26, 291 N.E.2d 698; *McIntire v. State* (1967), 248 Ind. 142, 223 N.E.2d 347. It may also deal with matters personally within the trial judge's knowledge, as where a pleading is filed containing insolent or obstreperous material. *LaGrange v. State* (1958), 238 Ind. 689, 153 N.E.2d 593; *Kerr v. State* (1923), 194 Ind. 147, 141 N.E. 308. In such instances the trial judge may be compelled to take immediate action to restore order and respect. *Brennan v. State* (1961), 242 Ind. 79, 173 N.E.2d 312. Owing to the urgency of the situation, direct contempt does not contemplate that the disqualification or recusation of the trial judge is or should be necessary before the contemnor can be punished; but where the allegedly contemptuous conduct is not punished immediately and summarily, classification of the conduct as a direct contempt becomes suspect. As our Supreme Court stated in *Brennan, supra:*

> "There is no showing in this case that immediate punishment was necessary to maintain order in the court and a respect for its authority. Such an element being totally absent, there is a failure of proof of direct contempt."

242 Ind. at 83, 173 N.E. at 313.

There was no showing in Jacobsen's case that immediate punishment was necessary to maintain order in the court and a respect for its authority. Skolnick's pleading containing Jacobsen's affidavit was filed on July 25, 1975. The trial judge ordered Jacobsen on July 29 to show cause why he should not be held in direct contempt of court. After a show cause hearing in front of the trial judge on August 6, Jacobsen was convicted of direct criminal contempt. This conviction came eleven days after the filing of the pleading containing Jacobsen's affidavit. Where the contumacious conduct is not punished immediately, the trial judge against whom the contumacious conduct is directed should have a duty to disqualify himself from sitting in judgment of the alleged contemnor.

· The federal courts are in accord with this principle. They conclude that where punishment does not immediately follow the contumacious conduct, more may be required in the way of procedural due process than would have been necessary had immediate action been taken. *See Mayberry v. Pennsylvania* (1971), 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532; *Bloom v. Illinois* (1968), 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522; *In re Oliver* (1948), 333 U.S. 257; *United States v. Seale* (7th Cir. 1972), 461 F.2d 345. If there is to be a delay in the punishment, due process requires that a disinterested judge determine whether the

conduct is contumacious and punishable. *Mayberry, supra.* In *Mayberry,* where the conduct consisted of a personal vilification of the trial judge and the conduct carried with it the potential of bias on the part of the trial judge in making a determination, the Court held that the vilified judge could not sit in judgment of the alleged contemnor. Rather, the contemnor is entitled to a hearing before a judge other than the one he has reviled. *Mayberry, supra,* 400 U.S. at 466, 91 S.Ct. 499. The Seventh Circuit found the dictates of *Mayberry* directly applicable in *Seale, supra,* and noted that,

> "[a]t least in the absence of personal embroilment (a matter which we do not reach), the trial judge could have cited Seale for contempt instantly even though he was personally attacked. [Citations omitted.] The need for order in the courtroom to be achieved through the deterrent effect of an immediate citation of the contemnor is thought to override the possibility of bias on the part of the trial judge. . . . ."

461 F.2d at 351.

Rule 42 of the Federal Rules of Criminal Procedure furthermore provides that the trial judge must disqualify himself from presiding at a contempt hearing, unless he has the alleged contemnor's consent to preside, where the alleged contempt involves disrespect to or criticism of the judge and is not punished summarily.[2]

Jacobsen's affidavit attacked the trial judge by insinuating impropriety of judicial conduct. Although the Indiana Supreme

Court has not directly considered the issue of disqualification of a trial judge, in a later contempt proceeding, where the trial judge was the object of the contumacious conduct, it has recognized the potential for bias in such a situation. In *State ex rel. Stanton v. Murray* (1952), 231 Ind. 223, 108 N.E.2d 251, the Court observed:

> "The delicacy there is in the judge's deciding whether an attack upon his own judicial action is mere criticism or real obstruction, and the possibility that impulse may incline his view to personal vindication are manifest." 231 Ind. at 241, 108 N.E.2d at 259, *quoting Craig v. Hecht* (1923), 263 U.S. 255, 279, 44 S.Ct. 103, 68 L.Ed. 293 (Taft, C. J., concurring).

The Court's language in *McIntire v. State, supra,* is especially appropriate in the present case:

> "The acts here charged, without question, are reprehensible and reflect upon the judge and judicial proceedings, and we can well understand the presiding judge's indignation arising from such an incident. However, there are other ways and means of prosecuting such charges under which a person so charged is not compelled to be tried by one so vitally and directly interested in the proceedings, as the judge in the case of direct contempt. Due process and justice require a distinction."

248 Ind. at 146, 223 N.E.2d at 349.

Because Jacobsen's contempt hearing should have been held before another trial judge, I would reverse the contempt conviction based on the material in his affidavit.

---

**2.** Rule 42 reads as follows:

"(a) Summary Disposition. A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

"(b) Disposition Upon Notice and Hearing. A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe

it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment."